CASE NO. 18-55367

# In the United States Court of Appeals
# For the Ninth Circuit

### HOMEAWAY.COM, INC. AND AIRBNB, INC.,
*Plaintiffs-Appellants*,

v.

### CITY OF SANTA MONICA,
*Defendant-Appellee*.

*Appeal from the United States District Court for the Central District of California,
Nos. 2:16-cv-6641, 2:16-cv-6645
The Honorable Otis D. Wright II, United States District Judge*

## APPELLANTS' OPENING BRIEF

Donald B. Verrilli, Jr.
Chad Golder
MUNGER, TOLLES & OLSON LLP
1155 F St., NW
Washington, D.C. 20004
Telephone: (202) 220-1100
Facsimile: (202) 220-2300

Jonathan H. Blavin
Joshua Patashnik
MUNGER, TOLLES & OLSON LLP
560 Mission Street, 27th Floor
San Francisco, CA 94105
Telephone: (415) 512-4000
Facsimile: (415) 512-4077

Joseph W. Cotchett
Alexandra P. Summer
COTCHETT, PITRE & McCARTHY, LLP
2716 Ocean Park Blvd., Suite 3088
Santa Monica, CA 90405
Telephone: (310) 392-2008
Facsimile: (310) 392-0111

John B. Major
MUNGER, TOLLES & OLSON LLP
350 South Grand Avenue, 50th Floor
Los Angeles, California 90071
Telephone: (213) 683-9100
Facsimile: (213) 687-3702

*Counsel for Plaintiff-Appellant Airbnb, Inc.*

Stephen M. Rummage
Ambika K. Doran
DAVIS WRIGHT TREMAINE LLP
1201 Third Avenue, Suite 2200
Seattle, Washington 98101
Telephone: (206) 622-3150
Facsimile: (206) 757-7700

*Counsel for Plaintiff-Appellant HomeAway.com, Inc.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant HomeAway.com, Inc. states the following:

HomeAway.com, Inc. is a Delaware corporation, which is wholly owned by Homeaway Holdings, Inc., a Delaware corporation, which is wholly owned by Expedia, Inc., a Washington corporation. Expedia, Inc. is wholly owned by Expedia Group, Inc., a publicly held Delaware corporation. Liberty Expedia Holdings, Inc., a publicly traded company, owns 10% or more of Expedia Group, Inc.'s stock.

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant Airbnb, Inc. states the following:

Airbnb, Inc. has no parent corporation and there is no publicly held corporation owning 10% or more of its stock.

# TABLE OF CONTENTS

**Page**

INTRODUCTION ....................................................................................1

JURISDICTIONAL STATEMENT ..........................................................5

STATEMENT OF THE ISSUES................................................................5

STATUTE ...............................................................................................6

STATEMENT OF THE CASE...................................................................6

    A.    Airbnb and HomeAway ..............................................................6

    B.    Santa Monica's Regulation of Hosting Platforms...................8

    C.    District Court Preliminary Injunction Proceedings.............12

SUMMARY OF ARGUMENT ................................................................12

STANDARD OF REVIEW .....................................................................15

ARGUMENT ........................................................................................16

I.    SECTION 230 OF THE COMMUNICATIONS DECENCY ACT
    PREEMPTS THE ORDINANCE........................................................16

    A.    The Ordinance Requires the Platforms to Monitor and Review
        the Content of Third-Party Listings ...................................18

    B.    The Ordinance Requires the Platforms to Remove Listings...............22

    C.    Santa Monica Cannot Evade Section 230 Immunity by
        Purporting to Target "Booking Transactions" ...................24

    D.    The District Court Ignored a Well-Developed Body of Case
        Law Holding That the CDA Protects Websites Facilitating
        Third-Party Transactions....................................................28

    E.    The Ordinance Stands as an Obstacle to the Accomplishment of
        Section 230's Goals............................................................32

    F.    *San Francisco* Is a Wrongly Decided Outlier ....................39

II.    THE ORDINANCE VIOLATES THE FIRST AMENDMENT .................42

    A.    The Ordinance Impermissibly Burdens Commercial Speech............42

    B.    The Ordinance Is Content-Based and Cannot Survive
        Heightened Scrutiny...........................................................48

**TABLE OF CONTENTS**
**(continued)**

**Page**

C. The Ordinance Lacks a Scienter Requirement ...................................51

III. THE ORDINANCE VIOLATES THE CALIFORNIA COASTAL
ACT .................................................................................................51

A. The Ordinance Is Substantively Invalid Under the Coastal Act .........53

B. The Ordinance Is Procedurally Invalid Under the Coastal Act ..........55

IV. THE PLATFORMS FACE IRREPARABLE HARM ABSENT AN
INJUNCTION.................................................................................58

V. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST
FAVOR THE PLATFORMS ........................................................60

CONCLUSION ...........................................................................................60

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Airbnb, Inc. v. City & Cty. of San Francisco*,
217 F. Supp. 3d 1066 (N.D. Cal. 2016)........................................................passim

*Almeida v. Amazon.com, Inc.*,
456 F.3d 1316 (11th Cir. 2006) .........................................................................17

*American Trucking Ass'ns, Inc. v. City of Los Angeles*,
559 F.3d 1046 (9th Cir. 2009) ....................................................................59, 60

*Arellano v. Clark Cty. Collection Serv., LLC*,
875 F.3d 1213 (9th Cir. 2017) ....................................................................14, 33

*Backpage.com, LLC v. McKenna*,
881 F. Supp. 2d 1262 (W.D. Wash. 2012) ........................................................49

*Barnes v. Yahoo!, Inc.*,
570 F.3d 1096 (9th Cir. 2009) ......................................................16, 18, 23, 39

*Bartnicki v. Vopper*,
532 U.S. 514 (2001)............................................................................................49

*Bates v. State Bar of Ariz.*,
433 U.S. 350 (1977)............................................................................................45

*Batzel v. Smith*,
333 F.3d 1018 (9th Cir. 2003) ...................................................................passim

*Bennett v. Google, LLC*,
882 F.3d 1163 (D.C. Cir. 2018).........................................................................35

*Boos v. Barry*,
485 U.S. 312 (1988)............................................................................................51

*Braun v. Soldier of Fortune Magazine, Inc.*,
968 F.2d 1110 (11th Cir. 1992) ........................................................3, 4, 14, 47

*Brown v. Entertainment Merchants Ass'n*,
564 U.S. 786 (2011)............................................................................................50

iii

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*City of Chicago v. StubHub!, Inc.*,
624 F.3d 363 (7th Cir. 2010) ..............................................................30

*Cohen v. Facebook, Inc.*,
252 F. Supp. 3d 140 (E.D.N.Y. 2017) ................................................25

*Corbis Corp. v. Amazon.com, Inc.*,
351 F. Supp. 2d 1090 (W.D. Wash. 2004) .........................................29

*Crosby v. National Foreign Trade Council*,
530 U.S. 363 (2000)............................................................................33

*Disney Enterprises, Inc. v. VidAngel, Inc.*,
869 F.3d 848 (9th Cir. 2017) ..............................................................16

*Doe v. Internet Brands, Inc.*,
824 F.3d 846 (9th Cir. 2016) ........................................13, 18, 19, 20

*Doe v. MySpace, Inc.*,
528 F.3d 413 (5th Cir. 2008) ........................................................19, 25

*Eimann v. Soldier of Fortune Magazine, Inc.*,
880 F.2d 830 (5th Cir. 1989) ..............................................................47

*Elrod v. Burns*,
427 U.S. 347 (1976)............................................................................59

*Evans v. Hewlett-Packard Co.*,
2013 WL 5594717 (N.D. Cal. Oct. 10, 2013) ...................................29

*Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*,
521 F.3d 1157 (9th Cir. 2008) (en banc) ....................................passim

*Fields v. Twitter, Inc.*,
217 F. Supp. 3d 1116 (N.D. Cal. 2016),
*aff'd*, 881 F.3d 739 (9th Cir. 2018)...............................................19, 32

*Force v. Facebook, Inc.*,
2018 WL 472807 (E.D.N.Y. Jan. 18, 2018)..................................31, 32

iv

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*ForSaleByOwner.com Corp. v. Zinnemann*,
  347 F. Supp. 2d 868 (E.D. Cal. 2004) ...............................................50

*Geier v. American Honda Motor Co.*,
  529 U.S. 861 (2000)..........................................................................33

*Gibson v. Craigslist, Inc.*,
  2009 WL 1704355 (S.D.N.Y. June 15, 2009) ....................................20

*Goddard v. Google, Inc.*,
  2008 WL 5245490 (N.D. Cal. Dec. 17, 2008)....................................25

*Gonzalez v. Google, Inc.*,
  282 F. Supp. 3d 1150 (N.D. Cal. 2017)..............................................25

*Green v. AOL*,
  318 F.3d 465 (3d Cir. 2003) ..............................................................19

*Hiam v. HomeAway.com, Inc.*,
  267 F. Supp. 3d 338 (D. Mass. 2017),
  *aff'd*, 2018 WL 1755803 (1st Cir. Apr. 12, 2018)..............................18

*Hines v. Davidowitz*,
  312 U.S. 52 (1941)..............................................................................33

*Hinton v. Amazon.com.dedc, LLC*,
  72 F. Supp. 3d 685 (S.D. Miss. 2014) ...............................................29

*Inman v. Technicolor USA, Inc.*,
  2011 WL 5829024 (W.D. Pa. Nov. 18, 2011).....................................29

*International Franchise Ass'n, Inc. v. City of Seattle*,
  803 F.3d 389 (9th Cir. 2015) ..................................................42, 43, 59

*Jane Doe No. 1 v. Backpage.com, LLC*,
  817 F.3d 12 (1st Cir. 2016),
  *cert. denied*, 137 S. Ct. 622 (2017).........................................17, 30, 31

## TABLE OF AUTHORITIES
### (continued)

**Page(s)**

*Jones v. Dirty World Entm't Recordings LLC*,
   755 F.3d 398 (6th Cir. 2014) ...............................................................17

*Kimzey v. Yelp! Inc.*,
   836 F.3d 1263 (9th Cir. 2016) .....................................................passim

*Klein v. City of San Clemente*,
   584 F.3d 1196 (9th Cir. 2009) ...........................................................60

*La Park La Brea A LLC v. Airbnb, Inc.*,
   285 F. Supp. 3d 1097 (C.D. Cal. 2017) ..................................17, 28, 36

*Melendres v. Arpaio*,
   695 F.3d 990 (9th Cir. 2012) .............................................................60

*Minneapolis Star & Tribune Co. v. Minnesota Comm'r of Revenue*,
   460 U.S. 575 (1983)...........................................................................43

*Morales v. Trans World Airlines, Inc.*,
   504 U.S. 374 (1992).............................................................................58

*National Meat Ass'n v. Harris*,
   565 U.S. 452 (2012)...................................................25, 26, 27, 41

*New York v. Ferber*,
   458 U.S. 747 (1982)............................................................................51

*News & Sun Sentinel Co. v. Board of Cty. Comm'rs*,
   693 F. Supp. 1066 (S.D. Fla. 1987) .............................................49, 50

*Pennie v. Twitter, Inc.*,
   281 F. Supp. 3d 874 (N.D. Cal. 2017)...............................................20

*Perfect 10, Inc. v. CCBill LLC*,
   488 F.3d 1102 (9th Cir. 2007) ...........................................................17

*Pimentel v. Dreyfus*,
   670 F.3d 1096 (9th Cir. 2012) ......................................................15, 16

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Pitt News v. Pappert*,
379 F.3d 96 (3d Cir. 2004) .........................................................44, 45

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
413 U.S. 376 (1973).......................................................................47

*Planned Parenthood of Idaho, Inc. v. Wasden*,
376 F.3d 908 (9th Cir. 2004) ...............................................51

*Reed v. Town of Gilbert*,
135 S. Ct. 2218 (2015).....................................................48

*Rubin v. Coors Brewing Co.*,
514 U.S. 476 (1995)........................................................50

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*,
502 U.S. 105 (1991).............................................4, 44, 46

*Smith v. California*,
361 U.S. 147 (1959).........................................................51

*Sorrell v. IMS Health Inc.*,
564 U.S. 552 (2011)..................................................passim

*Thompson v. Western States Med. Ctr.*,
535 U.S. 357 (2002)........................................................48

*Universal Commc'n Sys., Inc. v Lycos, Inc.*,
478 F.3d 413 (1st Cir. 2007)............................................34

*Valle del Sol Inc. v. Whiting*,
732 F.3d 1006 (9th Cir. 2013) ..........................................58

*Village of Schaumburg v. Citizens for a Better Env't*,
444 U.S. 620 (1980)........................................................43

*Wos v. E.M.A. ex rel. Johnson*,
568 U.S. 627 (2013)..................................................passim

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Zeran v. America Online, Inc.*,
129 F.3d 327 (4th Cir. 1997) ...............................................................17

### STATE CASES

*City of Dana Point v. California Coastal Comm'n*,
217 Cal.App.4th 170 (2013) ................................................................57

*Divers' Envtl. Conservation Org. v. State Water Res. Control Bd.*,
145 Cal.App.4th 246 (2006) ................................................................54

*Donaher v. Vannini*,
2017 WL 4518378 (Me. Super. Ct. Aug. 18, 2017) ....................18, 28

*Douda v. California Coastal Comm'n*,
159 Cal.App.4th 1181 (2008) ..............................................................56

*Greenfield v. Mandalay Shores Cmty. Ass'n*,
230 Cal.Rptr.3d 827 (Ct. App. 2018) ...........................................54, 58

*Gualala Festivals Comm. v. California Coastal Comm'n*,
183 Cal.App.4th 60 (2010) ..................................................................57

*Hill v. StubHub, Inc.*,
727 S.E.2d 550 (N.C. Ct. App. 2012).............................................29, 30

*MDA City Apartments, LLC v. Airbnb, Inc.*,
2018 WL 910831 (Ill. Cir. Ct. Feb. 14, 2018)..............................18, 28

*Milgram v. Orbitz Worldwide, Inc.*,
16 A.3d 1113 (N.J. Super. Ct. Law Div. 2010)..................................29

*Napa Valley Educators' Ass'n v. Napa Valley Unified Sch. Dist.*
194 Cal.App.3d 243 (1987) ................................................................55

*Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles*,
55 Cal.4th 783 (2012) ...................................................................52, 55

viii

# TABLE OF AUTHORITIES
## (continued)

Page(s)

*Redell v. California Coastal Comm'n*,
180 Cal.App.4th 956 (2009) .................................................................54

*Ross v. California Coastal Comm'n*,
199 Cal.App.4th 900 (2011) .................................................................54

*Stoner v. eBay, Inc.*,
2000 WL 1705637 (Cal. Super. Ct. Nov. 1, 2000)..........................20, 29, 30, 36

*Surfrider Found. v. California Coastal Comm'n*,
26 Cal.App.4th 151 (1994) .................................................................57

*Surfrider Found.v. Martins Beach 1, LLC*,
14 Cal.App.5th 238 (2017),
*petition for cert. filed*, 17-1198 (U.S. Feb. 26, 2018).......................................57

*Yost v. Thomas*,
36 Cal.3d 561 (1984) .................................................................52, 54

FEDERAL STATUTES

21 U.S.C. § 601 *et seq.*..............................................................................26

28 U.S.C. § 1292 ..............................................................................5

28 U.S.C. § 1331 ..............................................................................5

47 U.S.C. § 230 ..............................................................................passim

Pub. L. 115–164, § 2, Apr. 11, 2018, 132 Stat. 1255 .............................................31

STATE STATUTES

14 Cal. Code Regs. § 13554..............................................................................55, 56

Cal. Pub. Res. Code § 30001.5 ..............................................................................54

Cal. Pub. Res. Code § 30009 ..............................................................................52

Cal. Pub. Res. Code § 30103 ..............................................................................52

# TABLE OF AUTHORITIES
## (continued)

Page(s)

Cal. Pub. Res. Code § 30210 .......................................................................15, 53, 54

Cal. Pub. Res. Code § 30213 .............................................................................52, 54

Cal. Pub. Res. Code § 30500 ...................................................................................52

Cal. Pub. Res. Code § 30514 ...................................................................................55

Cal. Pub. Res. Code § 30600 .............................................................................57, 58

## CONSTITUTIONAL PROVISIONS

U.S. Const. amend. I ........................................................................................passim

## LEGISLATIVE MATERIALS

141 Cong. Rec. H8471 (daily ed., Aug. 4, 1995) ....................................................22

H.R. Rep. No. 115-572, pt. 1 (2018) .......................................................................31

## OTHER AUTHORITIES

70 Ops. Cal. Atty. Gen. 220, 1987 WL 247254 (Sept. 10, 1987) .....................55, 56

Aaron Smith, Pew Research Center, *Shared, Collaborative, and On Demand: The New Digital Economy* (2016), http://www.pewinternet.org/files/2016/05/PI_2016.05.19_Sharing-Economy_FINAL.pdf ...........................................................................................38

PricewaterhouseCoopers, *The Sharing Economy – Sizing the Revenue Opportunity* (2015), http://www.pwc.co.uk/issues/megatrends/collisions/sharingeconomy/the-sharing-economy-sizing-the-revenueopportunity.html .............................38

Rudy Telles, Jr., Economics and Statistics Administration, *Digital Matching Firms: A New Definition in the "Sharing Economy" Space* (June 3, 2016) https://www.esa.gov/sites/default/files/digital-matching-firms-new-definition-sharing-economy-space.pdf ...............................................................38

**INTRODUCTION**

In January 2017, Santa Monica had a problem. The City found it "extremely difficult" to enforce its restrictive laws on short-term residential rentals "without the cooperation of internet companies which facilitate both legal and illegal short term rentals." ER-30. Santa Monica therefore decided it needed to conscript online homesharing platforms like Airbnb and HomeAway ("the Platforms") into its enforcement efforts. But the City also knew that federal law stood in its way: Section 230 of the Communications Decency Act ("CDA") provides broad immunity to online marketplaces for third-party listings; Section 230 preempts local laws seeking to impose liability inconsistent with that broad immunity; and the First Amendment protects against content-based restrictions on commercial speech. Despite these high legal hurdles, Santa Monica was determined to find some way to compel the Platforms to police third-party listings, even if it meant impairing the robust e-commerce marketplace the CDA was intended to promote.

So Santa Monica got "creative." *Kimzey v. Yelp! Inc.*, 836 F.3d 1263, 1269 (9th Cir. 2016). Instead of passing a law directly requiring the Platforms to review, monitor, and remove third-party listings, Santa Monica enacted an Ordinance that regulates "Booking Transactions" occurring on those websites. And instead of passing a law directly regulating advertising, Santa Monica imposed severe penalties to punish hosting platforms if they take fees from "Booking

1

Transactions" for listings not registered with the City, thereby intimidating the Platforms into screening their listings before publication. In practice, this Ordinance has *exactly the same* prohibitory effect on the Platforms' publishing activities as would a law that directly forbade publication of listings for unregistered rental units. The City's circumvention of Section 230 and the First Amendment "pushes the envelope" of "artful" draftsmanship. *Kimzey*, 836 F.3d at 1265–66.

Because the Ordinance violates the CDA, the Constitution, and the California Coastal Act, the district court erred in denying the Platforms' request for a preliminary injunction:

*First*, the CDA preempts the Ordinance. Section 230 expressly invalidates any local law "inconsistent" with Section 230's broad protections for online publishers of third-party content. 47 U.S.C. § 230(e)(3). As Santa Monica *conceded*, the Platforms cannot process "Booking Transactions" under the Ordinance unless they first "determine whether the unit is properly licensed for rental," ER-617:23–25, which requires them to monitor third-party listings. And the record shows that, as a practical matter, the Platforms must remove content if the Ordinance takes effect. Because monitoring and removing content are each quintessential publisher functions, the Ordinance falls within the CDA's immunity and preemption provisions.

Further, conflict preemption principles bar the Ordinance because it stands as an obstacle to two core goals of the CDA:  promoting the development of e-commerce and preserving the vibrant free market for the Internet, with minimal government regulation.  *Batzel v. Smith*, 333 F.3d 1018, 1027 (9th Cir. 2003).  The existence of platforms like Airbnb and HomeAway—which allow residents to earn extra income to make ends meet, while giving visitors lower-cost accommodation options—is precisely the kind of innovation the CDA was enacted to foster.  In fact, allowing localities to circumvent the CDA by targeting transactions, rather than content directly, would put *every* online marketplace at risk, from established sites like eBay to innovative startups.  And Santa Monica's reading of the CDA would allow Craigslist to publish *the exact same* third-party listing as the Platforms, but *only* Craigslist would escape liability.  This would turn back the clock on e-commerce and render the modern Internet unrecognizable.  It "cannot be the case that the CDA and its purpose[s] … could be so casually eviscerated."  *Kimzey*, 836 F.3d at 1269.

*Second*, the Ordinance violates the First Amendment because the Platforms cannot discern whether a listing is illegal based on the "face" of the advertisement.  *Braun v. Soldier of Fortune Magazine, Inc.*, 968 F.2d 1110, 1118–19 (11th Cir. 1992).  As a result, the Platforms may need to "remove the listing, even if the listing owner has complied with the law."  ER-505.  "Such a chilling

effect would compromise the First Amendment interest in commercial speech by depriving protected speech of a legitimate and recognized avenue of access to the public." *Braun*, 968 F.2d at 1117 (citation and internal quotation marks omitted). It makes no difference that the Ordinance purports to target only "conduct," *i.e.*, booking transactions. The Ordinance's severe administrative and criminal penalties impose a "financial burden" that "operate[s] as [a] disincentive[] to speak." *Simon & Schuster, Inc. v. Members of New York State Crime Victims Bd.*, 502 U.S. 105, 117 (1991). The Ordinance is "inconsistent with the First Amendment." *Id.* at 115.

*Third*, the California Coastal Act preempts the Ordinance. The Act's unambiguous goal is to expand public access to the coast. But the Ordinance does exactly the opposite. Governing statutory authority, binding case law, and decisions by the California Coastal Commission—which administers the Act—make clear that vacation rental bans like Santa Monica's are inconsistent with the Coastal Act. Moreover, *all* restrictions on vacation rentals must be considered and approved by the Coastal Commission, but Santa Monica *never* sought the Commission's approval. The Ordinance is procedurally invalid under the Coastal Act, too.

The district court erroneously concluded that the Platforms did not establish a likelihood of success on any of these claims, and so it went no further. The other

4

preliminary injunction factors tip sharply in the Platforms' favor. If the Ordinance is not enjoined, the Platforms will face the immediate threat of prosecution and hefty penalties; their consumer goodwill will be damaged; and their constitutional rights will be endangered. In contrast, Santa Monica can (and does) enforce its Ordinance directly against non-compliant hosts. Further, the Platforms help (and will continue to help) the City enforce the Ordinance by telling users about Santa Monica's restrictions and requiring users to agree to follow them. Santa Monica's backdoor effort to coerce the Platforms into policing their websites' content is illegal, harmful, and contrary to the public interest. The district court's decision should be reversed.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331. It denied a preliminary injunction on March 9, 2018.

The Platforms filed timely notices of appeal on March 21, 2018. ER-13–17. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).

## STATEMENT OF THE ISSUES

A.  Whether the district court abused its discretion in denying the Platforms' preliminary injunction motion because it erred as a matter of law by holding that:

(1)  the CDA does not preempt the Ordinance;

(2)     the Ordinance does not violate the First Amendment; and

(3)     the Ordinance does not violate the California Coastal Act.

B.     Whether the Platforms satisfy the remaining factors relevant to entry of a preliminary injunction, which the district court did not reach.

## STATUTE

Section 230 of the CDA (47 U.S.C. § 230) and Santa Monica's Ordinance are attached as addenda.

## STATEMENT OF THE CASE

### A.     Airbnb and HomeAway

Airbnb and HomeAway provide online marketplaces for short-term housing accommodations.     Their websites allow people seeking and offering accommodations—guests and hosts, respectively—to find each other and enter into agreements to book those accommodations.     ER-390; ER-501.     Neither Airbnb nor HomeAway manages, operates, leases, or owns any properties listed on their sites, nor are they parties to agreements between guests and hosts.     ER-391; ER-501.     Hosts—not the Platforms—provide the content for their listings, such as description, price, and availability, and hosts agree they are "responsible for their Listings and Host Services."     ER-391, ER-402; *see* ER-503–04, ER-524.

The Platforms are compensated for their publication and related services in different ways.     Airbnb provides payment processing services that permit hosts to

6

receive payments electronically. ER-390. It receives a fee from the guest and host, which is a percentage of the booking fee. *Id.* In Airbnb's view, "[n]ot charging hosts an upfront fee for listing their rentals removes barriers to entry and makes it more likely for hosts to post their listings." *Id.* HomeAway owners pay for services by either paying per booking, based on a percentage of the amount charged by the host, or buying a subscription to advertise properties for a set period. ER-502. HomeAway users may arrange for rentals through online booking and for payments through online payment services using a third-party payment processor. ER-502–03.

The Platforms do not review the hundreds of thousands of listings before the listings appear on their websites. ER-391; ER-502. But both provide information about local laws and require users to agree to comply with those laws. In particular, Airbnb's and HomeAway's websites provide specific guidance about Santa Monica's laws. ER-392, ER-427–37; ER-503. When Airbnb hosts create listings in Santa Monica, they must "certify that [they] will follow applicable laws." ER-428. HomeAway owners agree they "are responsible for and agree to abide by all laws, rules, ordinances, or regulations applicable to the listing of their rental property." ER-524.

Short-term rentals provide meaningful benefits to hosts and communities. For example, in Los Angeles, Airbnb has generated more than $1.1 billion in

7

yearly economic activity, and the typical Airbnb host has earned $7,200 per year from hosting on Airbnb. ER-393–94, ER-445. These earnings impact hosts' lives: 13% of Los Angeles hosts say income from hosting prevented foreclosure on their homes; 10% say it saved them from eviction. ER-445. Similarly, studies show that a lack of affordable accommodations prevents many Californians from experiencing the coast. ER-110. Short-term rentals are a top option for coastal visitors. ER-125. About 40% of HomeAway's listings and 30% of Airbnb's listings are for properties in the Santa Monica coastal zone. ER-501; ER-394.

Despite these benefits, some cities have concerns about short-term rentals. The Platforms are committed to working with these cities, and have undertaken voluntary measures to address their concerns. *E.g.*, ER-393, ER-440–42.

## B. Santa Monica's Regulation of Hosting Platforms

Santa Monica's regulation of short-term rentals began in May 2015, when its City Council adopted Ordinance 2484CCS ("Original Ordinance"). The Original Ordinance banned short-term rentals of an entire unit ("Vacation Rentals"), but allowed "Home-Sharing," *i.e.*, rental of a portion of a unit when the host is on site during the stay. ER-22–24 (§§ 6.20.010(a); 6.20.020(a); 6.20.030). Home-Sharing hosts had to obtain a license and include license numbers in any listing advertised on a "Hosting Platform" like Airbnb or HomeAway. ER-53–55.

In addition to regulating hosts, the Original Ordinance barred "Hosting

Platforms" from "advertis[ing]" or "facilitat[ing]" rentals that violated Santa Monica's short-term rental laws, and it expressly required them to screen and remove listings for rentals that Santa Monica considered unlawful. ER-24 (§§ 6.20.030–6.20.050). After the Original Ordinance passed, Santa Monica issued the Platforms citations imposing fines in the tens of thousands of dollars, which they paid under protest. ER-449–99; ER-538–82. The citations also demanded that the Platforms "remove ... all ... advertisements for vacation rentals." *E.g.*, ER-452.

Facing mounting financial penalties, Airbnb and HomeAway sued to invalidate the Original Ordinance. In response, Santa Monica sought "a stay of proceedings to prepare and consider amendments" to "address the legal challenges raised" by the action. ER-608–09. The Santa Monica City Attorney told the Platforms that Santa Monica might look to the outcome of a lawsuit challenging a San Francisco ordinance before taking further action. ER-43.

San Francisco had passed a law requiring websites to verify that a rental was registered before publishing a listing, which the Platforms challenged. *Airbnb, Inc. v. City & Cty. of San Francisco*, 217 F. Supp. 3d 1066 (N.D. Cal. 2016). After Airbnb and HomeAway filed suit, San Francisco amended its law to prohibit platforms from providing "any reservation and/or payment service" for unregistered rentals. *Id.* at 1071. The district court in *San Francisco* denied a

preliminary injunction.  *Id.* at 1079.  The parties then settled by creating a safe harbor for Airbnb and HomeAway—without any admission as to the legality of the ordinance.  ER-63–91.

Following *San Francisco*, Santa Monica amended its law on January 24, 2017, enacting Ordinance 2535CCS (the "Ordinance").  ER-29.  The Ordinance retreats from the Original Ordinance's overt regulation of website content.  Still, it prohibits Hosting Platforms from completing a "Booking Transaction" for any listed property unless it appears on Santa Monica's registry at the time the Platform receives a fee for the transaction.  ER-34–35 (§ 6.20.050(c)).  It defines "Booking Transaction" as "[a]ny reservation or payment service provided by a person who facilitates a home-sharing or vacation rental transaction between a prospective transient user and a host."  ER-32 (§ 6.20.010(d)).  The Ordinance does not apply to bulletin board websites like Craigslist, "which do not charge for booking services, and act solely as publishers of advertisements for short term rentals."  ER-93.

Santa Monica made clear that the Ordinance was passed to "achiev[e]" the original "law's objective":  to compel the Platforms to eliminate all listings for rentals that Santa Monica considers unlawful.  ER-95.  Santa Monica targeted the Platforms because it claimed it is "difficult" to enforce its restrictions against third-party hosts without involving "internet companies which facilitate both legal

and illegal short term rentals."  ER-30.

The Ordinance requires Hosting Platforms to assist Santa Monica in enforcing its rental restrictions in two ways.  *First*, as Santa Monica *conceded*, the Ordinance requires the Platforms to "determine whether [a] unit is properly licensed for rental" before processing a booking for that property.  ER-617.  The Platforms cannot make that determination without reviewing each listing requested for a booking and attempting to verify that the property appears on the City's registry, a process that would need to occur hundreds of times daily.  ER-395–96; ER-504; *see* ER-393 (Airbnb has "approximately 1,400" Santa Monica listings); ER-501 (HomeAway has "more than 300" Santa Monica listings).  *Second*, because listings advertise properties available for booking, the Platforms must take steps to comply with the Ordinance *before* a guest requests a booking: either review and remove listings of properties not on the City's registry to prevent guests from clicking on properties only to find them unavailable to book, or change their websites in ways that make them less functional as e-commerce platforms.  ER-395–96; ER-504.

The Ordinance achieves its goal of forcing Hosting Platforms to "cooperate" in monitoring and policing short-term rentals by imposing substantial administrative and criminal penalties.  ER-30.  Each violation is an infraction punishable by a fine of up to $250 or a misdemeanor punishable by a fine up to

$500, imprisonment for no more than six months, or both. ER-36 (§ 6.20.100(a)). Violators also may be required to reimburse the City for investigative costs, pay administrative fines and penalties, and pay attorneys' fees to anyone who brings an action to remedy violations. *Id.* (§ 6.20.100(b), (c), (d)).

### C. District Court Preliminary Injunction Proceedings

On December 13, 2017, the Platforms moved for a preliminary injunction arguing, among other things, that the Ordinance violated the CDA, the First Amendment, and the California Coastal Act. On March 12, 2018, the district court denied that motion. ER-1–12. As to the CDA, the court held that the Ordinance "does not penalize Plaintiffs' publishing activities; rather, it seeks to keep them from facilitating business transactions on their sites that violate the law." ER-10. It also held that the Ordinance does not violate the First Amendment because the Ordinance "regulates conduct, not speech." ER-11. And it concluded that the Ordinance was neither procedurally nor substantively invalid under the California Coastal Act. ER-6–8. Because the district court found no likelihood of success on the merits, it never reached the remaining considerations relevant to entry of a preliminary injunction.

### SUMMARY OF ARGUMENT

The district court abused its discretion by denying a preliminary injunction.

I. The Platforms demonstrated a likelihood of the success on the merits.

A.    Section 230 of the Communications Decency Act bars Santa Monica's attempt to "circumvent the CDA's protections through 'creative'" legislative draftsmanship under both express and obstacle preemption principles. *Kimzey*, 836 F.3d at 1265.  Santa Monica *conceded* that the Platforms cannot process bookings until they first "determine whether the unit is properly licensed for rental."  ER-617:23–25.  That determination requires the Platforms to *monitor* third-party content, which is paradigmatic publisher activity.  *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 852–54 (9th Cir. 2016).  This monitoring requirement, on its own, triggers the CDA's protections and requires reversal.

But that is not the only way in which the Platforms are immune.  As a practical matter, the Ordinance also compels the Platforms to *remove* third-party content to prevent their websites from becoming littered with unbookable listings.  Removing content, like monitoring, is quintessential publication activity.  *Id*.  The Ordinance is therefore *doubly* preempted under Section 230(e)(3), which expressly provides that "[n]o cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."

The Ordinance also stands as an obstacle to the CDA's objectives of promoting the development of e-commerce and minimizing government intervention in the Internet.  *Batzel*, 333 F.3d at 1027.  If allowed to take effect, the Ordinance will force the Platforms to monitor and remove listings, or transform

themselves into 1990s-style bulletin boards—depriving consumers of the functionality that makes the Internet marketplace what it is today and impeding fulfillment of the CDA's purposes. *Id.* The Ordinance is therefore invalid under conflict preemption principles as well. *Arellano v. Clark County Collection Service, LLC*, 875 F.3d 1213, 1216 (9th Cir. 2017).

In reaching a contrary conclusion on Section 230, the district court relied on a wrongly-decided, outlier district court decision concerning San Francisco's similar ordinance. Further, the record here differs in a case-dispositive way from the record described in *San Francisco*.

B.    The Ordinance violates the First Amendment. Because the Platforms cannot determine whether any particular listing is illegal based on the face of the advertisement, "the fear of liability might impermissibly impose a form of self-censorship." *Braun*, 968 F.2d at 1117. The district court ignored this reality by concluding that the Ordinance regulates conduct, not speech. But laws imposing a financial burden on protected speech are as invalid under the First Amendment as direct speech regulations. This Ordinance imposes a severe financial burden and cannot withstand the heightened scrutiny required for content-based restrictions. Further, the Ordinance is invalid under the First Amendment because it purports to impose criminal penalties but lacks any *mens rea* requirement.

14

C.     The Ordinance violates the California Coastal Act because Santa Monica did not follow the Act's required procedures:  it did not seek Commission approval for its amendment to the City's Land Use Plan, nor did it obtain a Coastal Development Permit for its restriction on access to Santa Monica's coastline.  The Ordinance also conflicts with the Coastal Act's goal of ensuring "maximum access" to the coastal zone.  Cal. Pub. Res. Code § 30210.  It is therefore preempted.

II.     The Platforms will suffer irreparable harm if the Ordinance goes into effect.  They face severe criminal and civil penalties under a preempted law; the loss of free speech rights; damage to consumer goodwill; and harms from competitors like Craigslist that the Ordinance does not regulate.

III.     The balance of the equities and public interest weigh heavily in the Platforms' favor.  They will suffer significant irreparable harm if the Ordinance goes into effect, while Santa Monica can still enforce its short-term rental laws against hosts if the Ordinance is enjoined.

## STANDARD OF REVIEW

This Court reviews a decision denying a preliminary injunction for abuse of discretion.  *Pimentel v. Dreyfus*, 670 F.3d 1096, 1105 (9th Cir. 2012).  Legal conclusions are reviewed de novo.  *Id*.  A plaintiff is entitled to a preliminary injunction if it is likely to succeed on the merits; it is likely to suffer irreparable

harm in the absence of preliminary relief; the balance of equities tips in its favor; and an injunction is in the public interest. *Id.* This Court has adopted a "sliding scale" approach, "so that a stronger showing of one element may offset a weaker showing of another." *Id.* (citation omitted). A preliminary injunction may be appropriate if a movant raises "serious questions going to the merits" and the "balance of hardships ... tips sharply towards" it, so long as the other factors are satisfied. *Disney Enterprises, Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017).

## ARGUMENT

## I.   SECTION 230 OF THE COMMUNICATIONS DECENCY ACT PREEMPTS THE ORDINANCE

Section 230(c)(1) of the CDA immunizes websites like Airbnb and HomeAway from liability based on information provided by third parties. The statute affords immunity when (1) a party is a "provider or user of an interactive computer service," and (2) a law "seeks to treat" the party "as a publisher or speaker" (3) "of information provided by another information content provider." *Barnes v. Yahoo!, Inc.*, 570 F.3d 1096, 1100–01 (9th Cir. 2009). The first and third factors are indisputably met. The only issue is whether the Ordinance imposes liability on the Platforms as "publishers" of information provided by their users.

16

This Court has emphasized Section 230's "broad grant" of immunity for "webhosts." *Fair Hous. Council of San Fernando Valley v. Roommates.com, LLC*, 521 F.3d 1157, 1174–75, 1180 (9th Cir. 2008) (en banc). Other circuits have reached the same conclusion. *Jones v. Dirty World Entm't Recordings LLC*, 755 F.3d 398, 407 (6th Cir. 2014) (citing cases). Section 230 "establish[es] broad 'federal immunity to any cause of action that would make service providers liable for information originating with a third-party user of the service.'" *Perfect 10, Inc. v. CCBill LLC*, 488 F.3d 1102, 1118 (9th Cir. 2007) (quoting *Almeida v. Amazon.com, Inc.*, 456 F.3d 1316, 1321 (11th Cir. 2006) and *Zeran v. America Online, Inc.*, 129 F.3d 327, 331 (4th Cir. 1997)); *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12, 19 (1st Cir. 2016), *cert. denied*, 137 S. Ct. 622 (2017) (courts recognize "a capacious conception of what it means to treat a website operator as the publisher or speaker of information provided by a third party").[1] Given Section 230's breadth, "close cases … must be resolved in favor of immunity." *Roommates.com*, 521 F.3d at 1174.

Applying these principles, several courts have held the CDA protects Airbnb and HomeAway. *E.g.*, *La Park La Brea A LLC v. Airbnb, Inc.*, 285 F. Supp. 3d

---

[1] CDA immunity does not extend to claims arising under federal criminal law or intellectual property law, *see* 47 U.S.C. §§ 230(e)(1)–(2), nor does it extend to certain claims relating to prostitution or sex trafficking, *id.* § 230(e)(5).

1097, 1105 (C.D. Cal. 2017); *Hiam v. HomeAway.com, Inc.*, 267 F. Supp. 3d 338, 348 (D. Mass. 2017), *aff'd*, 2018 WL 1755803 (1st Cir. Apr. 12, 2018); *MDA City Apartments, LLC v. Airbnb, Inc.*, 2018 WL 910831, at *14 (Ill. Cir. Ct. Feb. 14, 2018); *Donaher v. Vannini*, 2017 WL 4518378 (Me. Super. Ct. Aug. 18, 2017). Section 230's broad immunity applies equally here.

## A. The Ordinance Requires the Platforms to Monitor and Review the Content of Third-Party Listings

The Ordinance treats the Platforms as "publishers" of third-party information by requiring them to monitor and review the content of listings that third-party hosts post on their websites. Santa Monica *conceded* that "to provide booking services in connection with a unit, [Airbnb and HomeAway] will have to determine whether the unit is properly licensed for rental." ER-617:23–25. And the record shows the only way for the Platforms to comply is to monitor the content of a third-party listing and compare it against the City's short-term rental registry before allowing any booking to proceed. This violates Section 230.

Monitoring and reviewing third-party content are paradigmatic publisher activities. This Court repeatedly has held that "publication involves reviewing, editing, and deciding whether to publish or to withdraw from publication third-party content." *Barnes*, 570 F.3d at 1102; *Internet Brands*, 824 F.3d at 852–54 (no CDA immunity because the duty alleged did not require defendant to "edit, monitor, or remove user generated content"). Thus, in *Roommates.com*, 521 F.3d

at 1174, the Court held a website could not be liable for housing discrimination based on content posted by third parties because it would have to engage in the publisher activity of "reviewing every essay ... to distinguish unlawful discriminatory preferences from perfectly legitimate statements."[2]

*Internet Brands* illustrates the line between permissible and impermissible regulation. There, this Court considered whether it was "inconsistent with section 230(c)(1) for the State of California to require an interactive computer service provider to warn its users about the threat of a known sexual predator." 824 F.3d at 850–51. The plaintiff alleged that two rapists used a modeling website to lure her to a fake audition where she was sexually assaulted and that Internet Brands, the website owner, "knew about the rapists but did not warn her or the website's other users." *Id.* at 848.

On the uniquely disturbing facts of that case, the Court concluded that Section 230 did not bar the plaintiff's failure-to-warn negligence claim. The Court reasoned that the plaintiff's claim had nothing to do with website content: the predators were *not* alleged to have posted "anything to the website," and the

---

[2] *See Doe v. MySpace, Inc*., 528 F.3d 413, 420 (5th Cir. 2008) ("decisions relating to the monitoring, screening, and deletion of content [are] actions quintessentially related to a publisher's role") (citation omitted); *Green v. AOL*, 318 F.3d 465, 471 (3d Cir. 2003) (same); *Fields v. Twitter, Inc.*, 217 F. Supp. 3d 1116, 1123 (N.D. Cal. 2016), *aff'd*, 881 F.3d 739 (9th Cir. 2018) (same).

plaintiff did *not* claim "to have been lured" or otherwise affected by any third-party posting. *Id.* at 851. Instead, the threat of sexual predation was *already* "known" to Internet Brands, and plaintiff's claim therefore did not impose a duty on the website to "conduct[] a detailed investigation" of any content. *Id*. The Court emphasized that the plaintiff sought to hold Internet Brands "liable for failing to warn her about information it obtained [about the predators] from an outside source"—*not* for failing to monitor website content. *Id*.; *see id*. at 849, 853.

In so doing, the Court drew a sharp line between causes of action that require website operators to monitor third-party website content (from which websites are immune under Section 230) and those that do not require monitoring. *Internet Brands* turned on the fact that the alleged duty to warn under California law would *not* "affect" how the website "monitors ... content." *Id*. at 851. To the contrary, the Court stressed that the website's "failure to monitor postings" was not "at issue," and it held that "Doe's failure to warn claim has nothing to do with Internet Brands' efforts, or lack thereof, to edit, *monitor*, or remove user generated content." *Id*. at 852 (emphasis added).[3]

---

[3] *See Pennie v. Twitter, Inc*., 281 F. Supp. 3d 874, 889–90 (N.D. Cal. 2017) (claims challenging Twitter's provision of accounts to Hamas barred by CDA as "Defendants could only determine which accounts are affiliated with Hamas by reviewing the content published by those accounts"); *Gibson v. Craigslist, Inc*., 2009 WL 1704355, at *4 (S.D.N.Y. June 15, 2009) (same); *Stoner v. eBay, Inc*., 2000 WL 1705637, at *3 (Cal. Super. Ct. Nov. 1, 2000) (same).

Santa Monica rightly does *not* dispute *Internet Brands*' central premise that monitoring third-party listings qualifies as publishing activity. Instead, it disputes whether the Ordinance punishes the Platforms for inadequate monitoring. ER-617:23–25. But this case squarely falls on the monitoring side of the line. To avoid liability for completing "Booking Transactions," the Platforms must scrutinize third-party listings to determine whether the listed properties appear on the Santa Monica registry. The only record evidence supports this conclusion: To comply with the Ordinance, the Platforms must "monitor and screen listings to ensure that no booking transactions between hosts and guests occur for short-term rentals in Santa Monica that are not listed on the City's registry." ER-395; *see* ER-504.

It is no answer, as Santa Monica suggested below, that "this challenge is hardly insurmountable for companies of Plaintiffs' valuation and sophistication." ER-617. The CDA does not provide immunity for a publisher's monitoring of third-party content *only if* it poses an "insurmountable" challenge. Congress could have drafted the CDA to provide immunity only when monitoring is difficult or only to companies with valuations below a certain threshold. But it did not. Santa Monica admits its Ordinance requires the Platforms, at risk of steep penalties, to monitor and review third-party content by determining whether a posted listing is licensed for rental. That admission is fatal under Section 230.

21

Moreover, Santa Monica's suggestion that it would be easy for the Platforms to monitor misses the point. The burden associated with enforcing any *particular* city's ordinance may seem modest. But Congress recognized that websites may face scores of requests from governments and private plaintiffs. *E.g.*, 141 Cong. Rec. H8471 (daily ed., Aug. 4, 1995) ("We are talking about ... thousands of pages of information every day, and to have that imposition imposed on [websites] is wrong.") (Representative Goodlatte). The "heart" of section 230 would be "cut out" by forcing websites "to face death by ten thousand duck-bites." *Roommates.com*, 521 F.3d at 1174. This Court must consider not only Santa Monica's law but also the potential proliferation of laws across jurisdictions, imposing varied requirements on all kinds and sizes of websites. If governments could impose idiosyncratic requirements like the Ordinance's, websites would grind to a halt under the burden of compliance with numerous (and varied) monitoring regimes. That is why Congress expressly preempted State and local laws "inconsistent" with Section 230's broad immunity for monitoring and reviewing activity.

## B. The Ordinance Requires the Platforms to Remove Listings

The Ordinance's monitoring requirement, standing alone, triggers Section 230 preemption. But the Ordinance also is invalid because, in operation and effect, it forces Airbnb and HomeAway to *remove* third-party content.

The decision whether to remove third-party content is publishing activity, as publication involves "deciding whether to publish or to withdraw from publication third-party content." *Barnes*, 570 F.3d. at 1102. "[A]ny activity that can be boiled down to deciding whether to exclude material that third parties seek to post online is perforce immune under section 230." *Roommates.com*, 521 F.3d at 1170–72.

Here, the Ordinance effectively compels the Platforms to remove third-party listings that are not on the City's registry. Common sense explains why. Guests visit Airbnb's and HomeAway's websites intending to book a rental once they identify a suitable property. If their chosen property is not on the City's registry, the Platforms will be unable to process the transaction without facing significant administrative and criminal penalties—leaving customers hanging on the verge of completing their transactions. The Platforms cannot leave in place a website chock-full of un-bookable listings. *E.g*., ER-395. As the *San Francisco* court understood, it makes no sense to "have people spend 20 minutes doing this thing only to get a message at the end saying cannot book." ER-297. And the substantial legal risks created by the Ordinance amplify the necessity of removing listings to avoid errors at the booking stage. ER-395; ER-505; *see* ER-462 (enforcement letter demanding Platforms "[r]emove all listings" from their sites); ER-463, ER- 469, ER-481–83, ER-490–92.

Given this unchallenged evidence and the basic realities about how hosting platforms work, the Ordinance operates to force Airbnb and HomeAway to *remove* user content. That is "precisely the kind of activity for which section 230 was meant to provide immunity." *Roommates.com*, 521 F.3d at 1170.

## C. Santa Monica Cannot Evade Section 230 Immunity by Purporting to Target "Booking Transactions"

The district court held that the Ordinance "falls outside the scope of the CDA protections" because "it does not penalize [the Platforms'] publishing activities; rather, it seeks to keep them from facilitating business transactions on their sites that violate the law." ER-10. In the district court's view, the Ordinance does not "require the removal of[] content provided to [the Platforms] by hosts, nor does it require [the Platforms] to verify content provided by hosts to ensure that short-term rental hosts comply with the law." ER-3. Although the statute purports to impose liability based only on a platform's completion of "Booking Transactions," the Ordinance does much more than that: in practice, it compels platforms to review, monitor, and remove content. The district court's form-over-substance approach cannot be squared with this Court's Section 230 cases or the Supreme Court's preemption precedent.

This Court has made clear that plaintiffs may not engage in "creative pleading in an effort to work around" Section 230's preemption provision.

24

*Kimzey*, 836 F.3d at 1265.[4]   The same is true for state and local legislatures, which are equally subject to CDA preemption.   Just as plaintiffs may not write artful complaints "to circumvent the CDA's protections," local legislatures may not "creative[ly]" draft ordinances to "work around" Section 230 and accomplish prohibited ends in a law that would be preempted if enacted directly.  *Id.* at 1266.  Courts must not "open the door to such artful skirting of the CDA's safe harbor provision."  *Id*.   To do so would undermine the "congressional recognition that the Internet … 'ha[s] flourished ... with a minimum of government regulation.'"  *Id.* (quoting 47 U.S.C. § 230(a)(4)).

In much the same way, the Supreme Court has rejected efforts to sidestep federal preemption through clever statutory construction.   In two recent cases, the Court held that states may not "evade the pre-emptive force of federal law by resorting to creative statutory interpretation or description at odds with the statute's intended operation and effect."  *Wos v. E.M.A. ex rel. Johnson*, 568 U.S. 627, 636 (2013); *see National Meat Ass'n v. Harris*, 565 U.S. 452, 464 (2012).   When

---

[4] "[C]ourts repeatedly have rejected attempts to recharacterize claims … to avoid § 230's prohibition on treat[ing] [the defendant] as a 'publisher' of information." *Goddard v. Google, Inc.*, 2008 WL 5245490, at *4 (N.D. Cal. Dec. 17, 2008); *see MySpace*, 528 F.3d at 419 (rejecting effort to recharacterize claim as "artful pleading" and "disingenuous"); *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 156–58 (E.D.N.Y. 2017) (same); *Gonzalez v. Google, Inc.*, 282 F. Supp. 3d 1150 (N.D. Cal. 2017) (same).

conducting a preemption analysis, courts must consider "what the state law in fact does, not how the litigant might choose to describe it." *Wos*, 568 U.S. at 637.

In *National Meat*, for example, the Court considered the preemptive effect of the Federal Meat Inspection Act ("FMIA"), 21 U.S.C. § 601 *et seq.*, which regulates a range of activities related to slaughterhouse operations. The Court held that the FMIA preempted a California law prohibiting the sale of certain meat products for human consumption. 565 U.S. at 468. California argued the FMIA did not preempt this aspect of its law because it regulated only the "last stage of a slaughterhouse's business"—*i.e.*, the "sale[]" of meat—rather than "a slaughterhouse's 'operations.'" *Id.* at 463.

The Court unanimously rejected this too-clever-by-half argument. It reasoned that the operation and effect of the sales ban would, as a practical matter, regulate the very slaughterhouse activities subject to FMIA preemption—even though the California law on its face regulated only the post-slaughter sale of meat, which the FMIA's express-preemption provision does not mention. *Id.* at 464. The Court held that "if the sales ban were to avoid the FMIA's preemption clause, then any State could impose any regulation on slaughterhouses just by framing it as a ban on the sale of meat produced in whatever way the State disapproved." *Id.* This, the Court reasoned, would "make a mockery of the FMIA's preemption provision." *Id.*

So too here.  As in *National Meat*, the face of the Ordinance regulates only the "last stage" of the online rental process, *i.e.*, a "booking transaction."  But the liability imposed at that stage will necessarily regulate earlier stages—which is exactly what Santa Monica intended, just as regulating slaughterhouse operations is exactly what California intended in banning certain meat sales.  If the Ordinance remains in place, Airbnb and HomeAway will have to monitor and review third-party content before the final stage of the booking process occurs.  Likewise, they will have to remove third-party content from their websites so their platforms are not cluttered with unbookable listings or listings that create a substantial risk of criminal liability if booked.  In other words, Santa Monica has done here *exactly* what the Court forbade in *National Meat*:  it has passed a law regulating the "sale" of third-party rental listings, but that law in operation and effect regulates preceding publishing activities protected by Section 230.

*Kimzey*, *National Meat*, and *Wos* call for a far more searching and realistic review of the Ordinance than the district court applied.  Together, those cases require courts to look beyond the Ordinance's artfully-drafted language and to instead examine its real-world operation and effect.  And when one considers the Ordinance's operation and effect, the undisputed record demonstrates it requires the Platforms to review, monitor, and remove third-party content.  Applying the proper analytical framework, what the Ordinance "in fact does," *Wos*, 568 U.S. at

27

637, clearly cannot be squared with Section 230's broad protections. Santa Monica cannot evade those immunities through "creative" statutory draftsmanship. *Kimzey*, 836 F.3d at 1265.

>    **D.    The District Court Ignored a Well-Developed Body of Case Law Holding That the CDA Protects Websites Facilitating Third-Party Transactions**

Like Santa Monica, others have tried to sidestep Section 230 by arguing the CDA allows liability when websites provide transaction services connected with disfavored (or even unlawful) content. But courts consistently recognize that this end-around does not work: holding websites liable for transaction services based on the content of a listing necessarily tethers liability to publication, which squarely violates the CDA. For online marketplaces like Airbnb and HomeAway, listings and transaction services are intertwined: the marketplace and booking mechanism are why hosts publish listings in the first place. For that reason, "[c]ourts have granted CDA protection to websites that process payments and transactions in connection with third-party listings, including Airbnb." *Park La Brea*, 285 F. Supp. 3d at 1106; *MDA City Apartments*, 2018 WL 910831, at *14 ("processing payments and transactions in connection with listings created by third-parties does not strip [Airbnb] of immunity under the CDA"); *Donaher*, 2017 WL 4518378, at *3 (same).

Cases involving eBay and StubHub illustrate the point. Each site offers an

online marketplace, where third parties list goods (eBay) or tickets (StubHub) for sale. Each was sued for facilitating allegedly illegal sales: eBay for its "own participation in selling contraband musical recordings," including by offering "payment services, for which additional fees are charged," *Stoner*, 2000 WL 1705637, at *2–3; and StubHub for "handling the mechanics required to complete ... transaction[s]" in unlawfully scalped tickets and charging a "fee" for these services, *Hill v. StubHub, Inc.*, 727 S.E.2d 550, 562–63 (N.C. Ct. App. 2012). But both courts found that facilitating allegedly illegal sales did *not* "strip[] Defendant of its immunity under 47 U.S.C. § 230." *Hill*, 727 S.E.2d at 563; *see Stoner*, 2000 WL 1705637, at *3 (same).[5]

Courts reach this conclusion because the "principal objective of the immunity provision is to encourage commerce over the Internet by ensuring that interactive computer service providers are not held responsible for how third parties use their services." *Stoner*, 2000 WL 1705637, at *3; *see Park La Brea*, 2017 WL 6799241, at *9 (holding Airbnb protected by CDA given "Congress'

---

[5] Many cases have held that the CDA protects online marketplaces against claims stemming from their alleged facilitation or handling of unlawful third-party transactions. *E.g.*, *Inman v. Technicolor USA, Inc.*, 2011 WL 5829024, at *6–7 (W.D. Pa. Nov. 18, 2011); *Evans v. Hewlett-Packard Co.*, 2013 WL 5594717, at *4 (N.D. Cal. Oct. 10, 2013); *Hinton v. Amazon.com.dedc, LLC*, 72 F. Supp. 3d 685, 689 (S.D. Miss. 2014); *Milgram v. Orbitz Worldwide, Inc.*, 16 A.3d 1113, 1121–22 (N.J. Super. Ct. Law Div. 2010); *Corbis Corp. v. Amazon.com, Inc.*, 351 F. Supp. 2d 1090, 1094, 1118 (W.D. Wash. 2004).

goal of 'promot[ing] the development of e-commerce,'" quoting *Batzel*, 333 F.3d at 1027). Indeed, "the threat of liability for failing to monitor effectively would, in the judgment of Congress, deter companies such as eBay" and other online marketplaces, including the Platforms, "from making their service available as widely and as freely as possible." *Id.*[6]

A separate line of cases explains how the CDA protects processing booking transactions. Courts, led by the First Circuit, have held that Section 230 bars attempts to regulate a website's "overall design and operation" with respect to third-party content, including features related to payment services. In *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d at 19, victims of sex trafficking brought suit against a website under the Trafficking Victims Protection Reauthorization Act. They alleged the website violated that Act by including certain design features that encouraged sex trafficking, such as a "lack of phone number verification" and the "acceptance of anonymous payments" for postings. *Id.* at 20–21. They insisted these features were part of an "affirmative course of conduct" distinct from traditional publishing functions that the CDA protects. *Id.* at 20.

---

[6] The district court cited *City of Chicago v. StubHub!, Inc.*, 624 F.3d 363, 366 (7th Cir. 2010), for the undisputed proposition that the CDA does not immunize non-publishing activity. ER-10. *Chicago* involved tax collection, not reviewing, monitoring, or removing third-party content. *Hill*, 727 S.E.2d at 563 n.4 (distinguishing *Chicago*).

The First Circuit disagreed. It held the "'publisher or speaker' language of section 230(c)(1) extends to the formulation of precisely the sort of website policies and practices" that are "part and parcel of the overall design and operation of the website." *Id*. at 20–21.[7] It explained that the CDA barred plaintiffs' claims because they "address the structure and operation of the Backpage website, that is, Backpage's decisions about how to treat postings." *Id*. at 21; *see Fields*, 217 F. Supp. 3d at 1124 (following *Backpage*; holding that Section 230 protects "Twitter's decisions to structure and operate itself as a 'platform'" and to allow members of ISIS to obtain multiple accounts on that platform); *Force v. Facebook, Inc.*, 2018 WL 472807, at *10 (E.D.N.Y. Jan. 18, 2018) (CDA protects "Facebook's decisions regarding the 'overall design and operation of its website'"

---

[7] As noted above, the current version of the CDA does not provide immunity for certain claims relating to prostitution or sex trafficking, *see supra* note 1 (citing 47 U.S.C. § 230(e)(5)). Congress recently amended the CDA in direct response to the allegations in the *Jane Doe No. 1*. H.R. Rep. No. 115-572, pt. 1, at 3 (2018) ("Unfortunately these websites, including online classified sites like Backpage.com … have also become one of the primary channels of sex trafficking."); *id*. at 4 (describing court cases finding Backpage.com immune under the pre-amendment version of Section 230); *see generally* Pub. L. 115–164, § 2, Apr. 11, 2018, 132 Stat. 1255 ("It is the sense of Congress that … section 230 of the Communications Act of 1934 … was never intended to provide legal protection to websites that unlawfully promote and facilitate prostitution and websites that facilitate traffickers in advertising the sale of unlawful sex acts with sex trafficking victims."). Congress did not, however, displace the First Circuit's repeated holdings that Section 230 protects website design and operation.

as to third-party content). The CDA likewise protects the Platforms' decision to structure and operate their websites to include reservation and booking-related services for the listings third-party hosts advertise on their sites.[8]

As these many courts recognize—but the district court ignored—if regulators could evade the CDA simply by purporting to target only websites' processing of transactions resulting directly from publication, that would create a gaping hole in the statute's protections for e-commerce sites. As such, any "State or local law," like Santa Monica's Ordinance, that tries to impose liability on publication indirectly is "inconsistent" with Section 230 and expressly preempted. 47 U.S.C. § 230(e)(3).

### E. The Ordinance Stands as an Obstacle to the Accomplishment of Section 230's Goals

The Ordinance also is invalid under obstacle preemption principles. The Ordinance strikes at the heart of Congress's goal of promoting the development of e-commerce—a goal this Court expressly identified in its first Section 230 case. *Batzel*, 333 F.3d at 1027. Although the Platforms made this obstacle preemption argument below, the district court never addressed it.

---

[8] In *San Francisco*, the district court stated that that the "First Circuit appears to take a more expansive view of Section 230(c) preemption than the Ninth Circuit," 217 F. Supp. 3d at 1073, but offered no analysis to support its view. Although this Court has never commented on the First Circuit's design-and-operation test, district courts in this Circuit have applied that test. *See, e.g.*, *Fields*, 217 F. Supp. 3d at 1124.

Obstacle preemption occurs when a local ordinance conflicts with federal law, such that the local law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372–73 (2000) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)). An "obstacle" exists whether it "goes by the name of 'conflicting; contrary to; repugnance; difference; irreconcilability; inconsistency; violation; curtailment; interference,' or the like." *Arellano*, 875 F.3d at 1216 (quoting *Geier v. American Honda Motor Co*., 529 U.S. 861, 873 (2000)). "What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects." *Crosby*, 530 U.S. at 373.

Congress described its purposes and objectives with respect to Section 230 in the statute itself. In Section 230(a), Congress listed a series of "Findings," including that the "Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation." Section 230(b) sets forth Congress's policy objectives. They include:

> (1) to promote the continued development of the Internet and other interactive computer services and other interactive media;

> (2) to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation.

Summarizing these findings and objectives, this Court has held that "Section 230 was enacted, in part, to maintain the robust nature of Internet communication, and accordingly, to keep government interference in the medium to a minimum." *Batzel*, 333 F.3d at 1027 (citations omitted). Congress recognized that the Internet could not flourish if intermediaries could be held liable for third-party content, "given the volume of material communicated through [those intermediaries], the difficulty of separating lawful from unlawful speech, and the relative lack of incentives to protect lawful speech." *Universal Commc'n Sys., Inc. v Lycos, Inc.*, 478 F.3d 413, 418–19 (1st Cir. 2007). Section 230 thus "sought to prevent lawsuits from shutting down websites *and other services* on the Internet." *Batzel*, 333 F.3d at 1027–28 (emphasis added).

More specifically, this Court and others have held that one of Congress's principal purposes in enacting Section 230 was to "encourage the unfettered and unregulated development of free speech on the Internet, and to promote the development of e-commerce." *Id.* at 1027. "[T]here is little doubt that the Cox-Wyden amendment, which added what ultimately became § 230 to the Act, sought to further First Amendment *and e-commerce interests on the Internet* while also promoting the protection of minors." *Id*. at 1028 (emphasis added). This Court has since reiterated this congressional purpose. In *Roommates.com*, for example, the Court (sitting en banc) noted that the "intent of Congress" was to "preserve the

free-flowing nature of Internet speech *and commerce* without unduly prejudicing the enforcement of other important state and federal laws." 521 F.3d at 1175 (emphasis added). The D.C. Circuit recently explained how well Congress achieved its goal, as Section 230 "paved the way for a robust new forum for public speech as well as a trillion-dollar industry centered around user-generated content." *Bennett v. Google, LLC*, 882 F.3d 1163, 1166 (D.C. Cir. 2018) (internal quotation marks omitted).

The Ordinance imposes a direct obstacle to this congressional goal. Exposure to criminal and civil liability for completing "Booking Transactions" would force the Platforms to fundamentally alter what has made them so successful in the e-commerce marketplace. If state and local authorities could freely regulate online transactions directly resulting from the posting of third-party content, then online marketplaces would no longer be able to engage in the vibrant e-commerce that has made the Internet what it is today. E-commerce generally—not just in the short-term rental industry—would be dramatically set back.

As the undisputed record evidence demonstrates, if this direct regulation on e-commerce is allowed to stand, Airbnb and HomeAway will be forced to turn back the clock on e-commerce. As the district court recognized, the "Ordinance does not apply to websites like Craigslist, 'which do not charge for booking services, and act solely as publishers of advertisements for short term rentals.'"

ER-4 (quoting ER-93). Thus, as an alternative to complying with the Ordinance by engaging in the publisher activities of monitoring, reviewing, and removing content, the Platforms may be forced to "stop payment and transaction processing services altogether in connection with third-party listings in Santa Monica," transforming themselves into 1990s-style bulletin boards. ER-396 (noting that this would require a "fundamental redesign of [Airbnb's] business model, website, and platform"); ER-504 (same).

This makes no sense, especially when one considers Congress's goals of promoting a vibrant, flourishing Internet and the development of e-commerce. Under the district court's reasoning, Craigslist could publish the exact same listing as the Platforms—advertising the exact same unregistered short-term rental—but only Craigslist would be immunized under the CDA because it has *less* advanced functionality and *less* appeal to modern online consumers. Congress did not intend to freeze e-commerce in amber in this fashion. *E.g.*, *Park La Brea*, 285 F. Supp. 3d at 1104 ("Immunity is not foreclosed simply because a website offers more than a 'bulletin board' service"); *Stoner*, 2000 WL 1705637, at *3 (same).[9]

---

[9] Even if the Platforms did not have to fully convert to Craigslist-like platforms, they still would have to fundamentally alter their websites in ways that undermine the benefits of modern e-commerce *and* violate the CDA in other ways. Requiring up-front monitoring of listings before "Booking Transactions" to avoid civil and criminal liability "would significantly delay the time it takes for a listing to appear on the websites as well as for a booking to occur," which "would undermine two

36

Airbnb and HomeAway are not the only e-commerce platforms that will suffer from the district court's erroneous interpretation of Section 230. Since the CDA was passed, other online third-party marketplaces have succeeded by using precisely the type of transaction model the Ordinance would thwart. "In the modern world of e-commerce, users simply expect that they will be able to enter into transactions online for goods and services advertised on platforms like Airbnb." ER-396. In no small part *because of* the immunity afforded by the CDA, the Internet has evolved well beyond the basic newsgroups and bulletin boards that existed decades ago. Consumers now have access to a wide range of third-party marketplaces, including established sites like Amazon, eBay, and StubHub, and a host of smaller websites like Etsy, Houzz, and Thumbtack. These services are some of the most successful and popular platforms on the Internet today. But the Ordinance—and the myriad laws and legal claims that will proliferate if the district court's ruling is affirmed—jeopardizes that success by purporting to regulate transactions as a way to regulate content *sub rosa*.

Independent studies establish the importance of modern e-commerce platforms like Airbnb and HomeAway. For example, one study by the federal government describes these platform-based marketplaces as the heirs to the early e-

---

key benefits of" the Platforms' websites, "speed and efficiency." ER-504; *see also* ER-395 (same).

commerce websites that emerged when the CDA was enacted and this Court was first interpreting it in *Batzel*.[10]  According to a 2016 Pew Research Center report, 50% of Americans have purchased goods on eBay and similar sites; 28% have purchased tickets on sites like StubHub; 22% have purchased handmade products on sites like Etsy; and 11% have used short-term rental sites like Airbnb and HomeAway.[11]  These e-commerce platforms generate billions of dollars for the U.S. and global economies, and they are expected to grow exponentially.  For example, according to a 2014 study by PricewaterhouseCoopers LLP, platform-based markets generated an estimated $15 billion in global revenues in 2013, which could grow to up to $335 billion by 2025.[12]

---

[10] Rudy Telles, Jr., Economics and Statistics Administration, *Digital Matching Firms: A New Definition in the "Sharing Economy" Space*, 2, 10 (June 3, 2016) https://www.esa.gov/sites/default/files/digital-matching-firms-new-definition-sharing-economy-space.pdf ("What began as small and informal online exchanges of goods and services via message boards and rudimentary websites has, with the widespread adoption of fast, reliable mobile smartphones and access to GPS, evolved into a collection of firms that connect millions of consumers with other private citizens who can provide goods and services quickly and efficiently.…  As with the introduction of e-commerce in the 1990s, Internet-based technologies in the form of digital matching apps have the potential to disrupt existing markets.").

[11] *See* Aaron Smith, Pew Research Center, *Shared, Collaborative, and On Demand: The New Digital Economy*, 53 (2016), http://www.pewinternet.org/files/2016/05/PI_2016.05.19_Sharing-Economy_FINAL.pdf.

[12] *See* PricewaterhouseCoopers, *The Sharing Economy – Sizing the Revenue Opportunity* (2015), http://www.pwc.co.uk/issues/megatrends/collisions/sharingeconomy/the-sharing-economy-sizing-the-revenueopportunity.html.

While the existence of these e-commerce platforms may not have been predictable to Congress in 1996, this dynamic innovation is exactly what Congress intended to promote when it enacted the CDA. *Barnes*, 570 F.3d at 1101 (noting that the CDA's "scope … differs from its genesis," and the "language of the statute does not limit its application" to just the types of cases and technologies that existed at the time Congress enacted Section 230). Forcing the Platforms to shoulder the burden of monitoring and removing listings, or to convert themselves into Craigslist-like websites, would indisputably impede this progress. And that result would stand as an obstacle to a core purpose of the CDA: "promot[ing] the development of e-commerce." *Batzel*, 333 F.3d at 1027.

### F. *San Francisco* Is a Wrongly Decided Outlier

The district court rested its cursory Section 230 analysis on the reasoning of an earlier district court decision, *Airbnb, Inc. v. City and County of San Francisco*, which found Section 230 did not preempt San Francisco's similar ordinance. 217 F. Supp. 3d at 1076. But *San Francisco*'s reasoning was incorrect, and the decision (like the decision here) ignores the many cases recognizing the CDA's protection of e-commerce. The district court erred in giving that flawed, outlying decision dispositive effect.

As an initial matter, *San Francisco* turned on the district court's characterization of the record in that case. *San Francisco* denied CDA immunity

because plaintiffs "failed to submit evidence showing that the Ordinance will in fact inevitably or perforce require them to monitor, remove or do anything at all to the content that hosts post." 217 F. Supp. 3d at 1075. Here, however, undisputed evidence establishes that Airbnb and HomeAway will have to review and monitor third-party content to comply with the Ordinance. *Supra* at 11 (discussing ER-395–96, ER-504). In fact, Santa Monica *concedes* the Platforms cannot comply with the Ordinance unless they "determine whether the unit is properly licensed for rental" before proceeding with each booking. ER-617:23–25. Thus, the record conclusively shows that the Ordinance will require the Platforms to engage in the very sort of review and monitoring of listings that Section 230 protects against.

As to content removal, *San Francisco* faulted the plaintiffs for failing to show it was "inevitable" that third-party content would be withdrawn from their websites. 217 F. Supp. 3d at 1075. But *San Francisco* ignored the Supreme Court's decision in *Wos*, which spoke in terms of assessing a statute's "operation and effect" and what a law "in fact does." 568 U.S. at 636–37. *Wos* does not speak in terms of inevitability.[13] And as a practical matter, the Ordinance violates the CDA because it conscripts Airbnb and HomeAway into enforcing the City's

---

[13] *National Meat* discussed the "inevitable" effects of the California law at issue, 565 U.S. at 464, but *Wos followed* that case and did not adopt any inevitability standard. Instead, *Wos* turned on the state law's "intended operation and effect." 568 U.S. at 636.

rental laws by forcing them to remove non-compliant third-party content from their websites. *E.g.*, ER-395.[14]

Even if *San Francisco*'s "inevitability" test were good law, *San Francisco* erred because the CDA equally preempts the alternative to compliance it identified, *i.e.*, platforms "charging fees for publishing listings, rather than for facilitating transactions." 217 F. Supp. 3d at 1075. Under this purported alternative, the Platforms would be forced to abandon their roles as e-commerce intermediaries *altogether*. *E.g.*, ER-396. Hosts would be able to advertise available properties, but guests and hosts would have to arrange payment separately for any rentals outside of the Platforms' websites. But as explained above, the CDA preempts any law that would force the Platforms to redesign their websites in this way—even assuming a viable market still exists for such platforms.

*San Francisco* found hosting platforms could comply with the ordinance there by either (a) removing content (which would plainly run afoul of Section 230's explicit protection of publisher activity) or (b) fundamentally transforming and regressing their modern e-commerce platforms to eliminate the booking

---

[14] Worse than the actual effect of the Ordinance—*i.e.*, "what it in fact does," *Wos*, 568 U.S. at 637—forcing the removal of content appears to have been Santa Monica's intent. When it enacted the Original Ordinance, Santa Monica demanded that platforms "remove all listings," and the revised Ordinance states its policy purpose as furthering the "objectives" of the original law, *supra* at 23. The City's consistent (and unlawful) intent is unmistakable.

function (which would stand as an obstacle to Congress's goals of developing e-commerce and minimizing government regulation on the Internet). As explained above, the CDA preempts the Ordinance either way. The district court therefore erred in relying on *San Francisco*, ignoring the many contrary decisions across the country, and falling for the same "artful" draftsmanship that renders the Ordinance preempted by the CDA, *Kimzey*, 836 F.3d at 1269.

## II. THE ORDINANCE VIOLATES THE FIRST AMENDMENT

### A. The Ordinance Impermissibly Burdens Commercial Speech

The district court separately erred in holding that the Platforms' "First Amendment claims will not succeed." ER-12. It rejected the Platforms' First Amendment claim because, in its view, the Ordinance targets only "a business transaction to secure a short-term rental," which it viewed as pure "conduct" without "any significant expressive element." *Id*. This reasoning misconstrues and misapplies settled First Amendment law.[15] The Ordinance violates the First

---

[15] The district court relied heavily on this Court's decision in *International Franchise Association, Inc. v. City of Seattle*, 803 F.3d 389, 408 (9th Cir. 2015), which held that the "threshold question is whether conduct with a significant expressive element drew the legal remedy or the ordinance has the inevitable effect of singling out those engaged in expressive activity." (Citation and quotation marks omitted.) But the district court addressed only the *first half* of that standard, holding that "the conduct banned by the Ordinance—booking transactions for residential properties not listed on the City's registry—does not have such a 'significant expressive element' as to draw First Amendment protection." ER-11. It ignored the *second half* of that standard: whether the Ordinance has the "effect

Amendment because it imposes a content-based financial burden on commercial speech by requiring the Platforms to screen advertisements, which are not illegal on their face, to avoid severe penalties.

This Court can easily dispose of the district court's exclusive focus on "conduct." The Supreme Court has long held that laws imposing a "financial burden" on a speaker's expression are subject to First Amendment scrutiny, even if they do not directly regulate expression. *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 566 (2011); *Minneapolis Star & Tribune Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 593 (1983) (special tax on printer's ink impermissibly burdened First Amendment rights); *Village of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 632 (1980) (municipality violated the First Amendment by requiring solicitors to donate to charity a percentage of proceeds received from door-to-door solicitation; although the ordinance did not on its face limit speech, it did so indirectly, since solicitation was "characteristically intertwined" with speech). "Lawmakers may no more silence unwanted speech by burdening its utterance than by censoring its content." *Sorrell*, 564 U.S. at 566. "If government were free to suppress disfavored speech by preventing potential speakers from being paid, there

---

of targeting expressive activity." *Int'l Franchise Ass'n*, 803 F.3d at 409. As explained below, the Ordinance has precisely that effect by imposing a severe financial and criminal burden on commercial speech.

would not be much left of the First Amendment." *Pitt News v. Pappert*, 379 F.3d 96, 106 (3d Cir. 2004) (Alito, J.).

*Simon & Schuster, Inc. v. Members of New York State Crime Victims Board*, 502 U.S. 105 (1991), illustrates this principle. In that case, the Court struck down New York's "Son of Sam" law, which limited a convicted criminal's ability to profit from expressive works related to his crime. The "Son of Sam" law did not facially restrain any speech. Instead, it merely required the author to pay to the victim of his crime any money he would earn from his publication. But even though the law regulated "conduct"—receiving payment for published works—the Court held that New York's restriction "establishes a financial disincentive to create or publish works with a particular content." *Id*. at 118. It made no difference whether the "speaker" was the criminal who wrote the book or the publishing company that sold it. *Id*. No matter who was considered the "speaker," the Court concluded the statute was "inconsistent with the First Amendment" because "New York has singled out speech on a particular subject for a financial burden that it places on no other speech and no other income." *Id*. at 123.

Here, the Ordinance puts the Platforms in *the same* position as Simon & Schuster—only worse because they do not know which third-party listings are unregistered. What's more, the Ordinance imposes *the same* financial burdens on Airbnb, HomeAway, and the third-party hosts that advertise home rentals. The

record establishes (and Santa Monica does not dispute) that Airbnb and HomeAway receive compensation for publication services by charging fees for bookings of listings advertised on their sites (and not just charging for listings themselves). *Supra* at 6–7. The Ordinance levies severe financial and criminal penalties on those bookings and hosting platforms' receipt of fees in connection with them: failure to comply with the Ordinance can result in hosting platforms facing civil penalties up to $250 per violation and criminal penalties up to $500 and/or up to six months imprisonment per violation, as well as administrative fines and penalties. ER-36; *see* Santa Monica Municipal Code §§ 1.09–1.10. In substance, those fines and penalties (compounded by the added burden of criminal sanctions) have the same effect as New York seizing the proceeds of a criminal's sale of his expressive work. A law, like the Ordinance, that prevents parties "from receiving payments for running … ads … clearly restricts speech." *Pitt News*, 379 F.3d at 105–06. It makes no difference that the Ordinance chills commercial speech (advertisements for third-party rentals) rather than a convict's movie, book, or magazine article. *Bates v. State Bar of Ariz.*, 433 U.S. 350, 364 (1977) (a "consumer's concern for the free flow of commercial speech often may be far keener than his concern for urgent political dialogue"); *Sorrell*, 564 U.S. at 566–67. What matters for First Amendment purposes is that the "financial burden" imposed by Santa Monica's Ordinance, like New York's law, "operate[s] as [a]

disincentive[] to speak." *Simon & Schuster*, 502 U.S. at 105. The Ordinance thus regulates "speech," even if it does so by penalizing certain "Booking Transactions."

The district court also did not consider the consequences of its overbroad conduct/speech distinction. If accepted, the district court's theory would allow the government to ban a wide swath of otherwise protected speech, especially on the Internet. Rather than prohibit advertisements for disfavored goods or services, the government could instead forbid websites from processing sales of the same goods—knowing this will curb the protected speech embodied in advertising. Similarly, it could impose onerous licensing requirements on any website permitting third-party advertising. It could even regulate paid online content—a digital subscription to the *L.A. Times*, for example—by limiting publishers' payment processing terms. The First Amendment does not tolerate such indirect regulation of protected expression. Yet that that is exactly what Santa Monica has done here—and exactly what the district court authorized with its narrow conception of First Amendment "speech."

Because it failed to grapple with the fact that speech can be chilled by targeting conduct, the district court did not consider whether the Ordinance chills speech. But it does exactly that. Although the First Amendment does not protect advertisements promoting obviously illegal activity, *Pittsburgh Press Co. v.*

46

*Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 388–89 (1973), it does protect advertisements that do not *on their face* invite illegal activity, *Braun*, 968 F.2d at 1118–19; *Eimann v. Soldier of Fortune Magazine, Inc.*, 880 F.2d 830, 837 (5th Cir. 1989). Indeed, the First Amendment *must* protect advertisements that do not invite illegality on their face; otherwise, "the fear of liability might impermissibly impose a form of self-censorship on publishers." *Braun*, 968 F.2d at 1117. "The absence of a duty requiring publishers to investigate the advertisements they print … guarantee[s] that the burden placed on publishers will not impermissibly chill protected commercial speech." *Id*. at 1119.

Here, listings are *not* unlawful on their face. The ads do not show whether a property is registered as a lawful homeshare. ER-34–35. And even if the property does not appear on Santa Monica's registry when listed, a later "Booking Transaction" may be lawful, as the host may register the property after posting the listing, but before the booking occurs. As a result, the Platforms cannot know merely by reviewing their listings whether the commercial speech they publish on their websites proposes an illegal transaction; at a minimum, compliance with the Ordinance would require them to "investigate the advertisements they print," raising the risk that commercial speech will be "impermissibly chill[ed]." *Braun*, 968 F.2d at 1119. And the undisputed evidence shows this lack of facial clarity can cause hosting platforms to overcompensate by removing lawful listings:

"[G]iven the prospect of criminal punishment and hefty fines, if [a platform] has any doubt about the lawfulness of a particular listing, it will likely have to remove the listing, even if the listing owner has complied with the law." ER-505. This chilling effect imposes a "burden on protected expression" that violates the First Amendment. *Sorrell*, 564 U.S. at 565.

## B. The Ordinance Is Content-Based and Cannot Survive Heightened Scrutiny

The Ordinance is subject to heightened scrutiny as a content-based restriction on speech. *Sorrell*, 564 U.S. at 570. Because the Ordinance regulates speech based on whether the listings advertise short-term rentals, it is "presumptively unconstitutional." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015).

Typically, "it is all but dispositive to conclude that a law is content-based." *Sorrell*, 564 U.S. at 571. "[I]t is [Santa Monica's] burden to justify its content-based law as consistent with the First Amendment." *Id.* at 571–72. It must show that the law "directly advances a substantial governmental interest," and there must be a "fit between the legislature's ends and the means chosen to accomplish those ends." *Id.* at 572. If the City "could achieve its interests in a manner that does not restrict speech, or that restricts less speech, [it] must do so." *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 371 (2002).

Santa Monica cannot satisfy this stringent standard. At bottom, the

48

Ordinance is designed to regulate unlawful rentals. It achieves that end by conscripting hosting platforms into Santa Monica's enforcement efforts by punishing them if they allow a transaction for a listing for an unregistered property. But Santa Monica has an available enforcement mechanism without *any* effect on the Platforms' commercial speech. "The normal method for deterring unlawful conduct is to impose an appropriate punishment on the person who engages in it." *Bartnicki v. Vopper*, 532 U.S. 514, 529–30 (2001). The City can (and does) review listings and enforce the Ordinance against hosts who operate unlawful rentals. ER-351, ER-355 (noting effectiveness of City enforcement); *see Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1284 (W.D. Wash. 2012) (invalidating law banning sex ads because state "fail[ed] to demonstrate why a law targeting only the individuals who post ads would not be effective").

It makes no difference that "[f]ull enforcement of the underlying ordinances may be costly and difficult." *News & Sun Sentinel Co. v. Bd. of Cty. Comm'rs*, 693 F. Supp. 1066, 1073 (S.D. Fla. 1987). Santa Monica was, of course, motivated by that concern here. "[E]nforcement of the City's regulations on home-sharing … can be extremely difficult without the cooperation of Internet companies which facilitate both legal and illegal short term rentals." ER-30. But the City may not "shift[] the burden of enforcing the law" simply because it would be easier or less expensive. *News & Sun Sentinel*, 693 F. Supp. at 1072. Because the City has

available alternatives to address illegal home rentals, the law is "more extensive than necessary" and therefore violates the First Amendment. *Rubin v. Coors Brewing Co.*, 514 U.S. 476, 491 (1995).

Further, the Ordinance is not tailored to its asserted purpose. It applies only to hosting platforms that receive a fee for a booking (such as the Platforms), *not* to online (or offline) bulletin board sites that advertise the very same properties but have no booking functionality (like Craigslist). The City Council report in support of the Original Ordinance, however, makes clear that hosts use bulletin board sites to list short-term rental properties, just as they use Airbnb and HomeAway; indeed, the report *begins* by identifying "Craigslist" as a primary site where hosts post listings. ER-359. By not regulating bulletin board sites, the Ordinance leaves untouched a significant category of websites that facilitate unregistered short-term rentals. This under-inclusiveness "raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 802 (2011); *ForSaleByOwner.com Corp. v. Zinnemann*, 347 F. Supp. 2d 868, 878–80 (E.D. Cal. 2004).

Because the Ordinance cannot withstand heightened scrutiny, the Platforms are likely to succeed on their First Amendment claim.

### C.     The Ordinance Lacks a Scienter Requirement

The Ordinance also violates the First Amendment because it imposes criminal penalties on publishers of listings without requiring that they know the listings at issue are unlawful.

"[C]riminal responsibility may not be imposed without some element of scienter on the part of the defendant." *New York v. Ferber*, 458 U.S. 747, 765 (1982); *Smith v. California*, 361 U.S. 147 (1959).  In defiance of this principle, the Ordinance makes it unlawful for any Hosting Platform to "complete any booking transaction" for a property "unless it is listed on the City's registry … at the time the hosting platform receives a fee for the booking transaction," ER-34–35, regardless of whether the platform knows the property is not on the registry.  By imposing criminal penalties on publishers without any *mens rea* requirement, the Ordinance violates the First Amendment.[16]

## III.    THE ORDINANCE VIOLATES THE CALIFORNIA COASTAL ACT

The district court also erred in concluding that the Platforms failed to demonstrate they would likely succeed in showing the Ordinance violates the

---

[16] This Court cannot construe the Ordinance to escape this scienter problem. *Planned Parenthood of Idaho, Inc. v. Wasden*, 376 F.3d 908, 925 (9th Cir. 2004) (declining to narrowly construe Idaho statute to avoid constitutional issue).  When faced with a *state* statute, federal courts "are without power to adopt a narrowing construction ... unless [it] is reasonable and readily apparent." *Boos v. Barry*, 485 U.S. 312, 330 (1988).  No such construction is "readily apparent" here:  adding a scienter requirement would conflict with the Ordinance's text.

California Coastal Act.

The Act regulates all development in a zone extending inland 1,000 yards from the California coast, including portions of Santa Monica. Cal. Pub. Res. Code § 30103. The Coastal Act does not displace a local government's ability to regulate land use, but it expressly preempts conflicting local regulations. *Id.* § 30005(a); *see Yost v. Thomas*, 36 Cal.3d 561, 573 (1984). Its express purpose is to ensure public access to California's coastline: "Lower cost visitor and recreational facilities shall be protected, encouraged, and, where feasible, provided." Cal. Pub. Res. Code § 30213. "[T]he Coastal Act is to be 'liberally construed to accomplish its purposes and objectives.'" *Pacific Palisades Bowl Mobile Estates, LLC v. City of Los Angeles*, 55 Cal.4th 783, 796 (2012) (quoting Cal. Pub. Res. Code § 30009).

The Act achieves its purposes by, *inter alia*, requiring local governments in the coastal zone to prepare a Local Coastal Program ("LCP"), which includes a Land Use Plan ("LUP"). Cal. Pub. Res. Code § 30500. An LUP must "indicate the kinds, location, and intensity of land uses, the applicable resource protection and development policies, and, where necessary, a listing of implementing actions." *Id*. § 30108.5. The Coastal Commission administers the Act. It must review and certify LCPs and any amendments thereto. If a locality does not have an LCP and wants to engage in "development" in the coastal zone, it must apply to

the Commission for a Coastal Development Permit ("CDP"). "Development" is defined as any "change[s] in the density or intensity of use of land." *Id.* § 30106.

In December 2016—just one month before Santa Monica passed the Ordinance—the Commission sent a letter to all coastal planning and community development directors, including Santa Monica, emphasizing that local policies limiting vacation rentals in the coastal zone violate the Act: "[V]acation rental prohibitions unduly limit public recreational access opportunities inconsistent with the Coastal Act." ER-228; *see* ER-227 (vacation rental regulation must be approved by the Commission). The City nonetheless ignored the Coastal Act's requirements—*and* the Coastal Commission's specific directives regarding short-term rental regulation.

## A. The Ordinance Is Substantively Invalid Under the Coastal Act

The district court did not address whether the Ordinance substantively violated the Coastal Act. Instead, it held only that the Commission's "comments regarding its interpretation of the Coastal Act are not binding on the Court." ER-8. Had it considered the substance, as it should have, a preliminary injunction would have been unavoidable.

The Ordinance's restrictions on short-term rentals in the coastal zone conflict with the Coastal Act's policy of "maximum access" to the California coast and promoting "recreational opportunities" in the coastal zone. Cal. Pub. Res.

Code § 30210; *see Yost*, 36 Cal.3d 561, 573. Even more specifically, the Ordinance conflicts with the Act's emphasis that "[l]ower cost visitor and recreational facilities shall be protected [and] encouraged." Cal. Pub. Res. Code § 30213. Indeed, the Act makes clear that "visitor-serving commercial recreational facilities designed to enhance public opportunities for coastal recreation shall have priority over private residential ... development." *Id.* § 30222; *see Greenfield v. Mandalay Shores Cmty. Ass'n*, 230 Cal.Rptr.3d 827, 828 (Ct. App. 2018).

For these reasons, the Commission has rejected blanket vacation rental bans, like the Ordinance's, as being inconsistent with the Act. ER-289, ER-250, ER-228, ER-593–94.[17] The Commission has emphasized that these restrictions conflict with the Act's policy to "[m]aximize public access to and along the coast and maximize public recreational opportunities in the coastal zone." Cal. Pub. Res. Code § 30001.5(c).

Because the Ordinance substantively conflicts with both the Act and the Commission's reasonable interpretation of it, state law preempts it. *Yost*, 36 Cal.3d

---

[17] Courts must "defer to the Commission's interpretation" where it is "reasonable and in keeping with the purposes of the [Coastal Act or] LCP." *Redell v. Cal. Coastal Comm'n*, 180 Cal.App.4th 956, 968 (2009); *see Divers' Envtl. Conservation Org. v. State Water Res. Control Bd.*, 145 Cal.App.4th 246, 252 (2006). Refusing to defer to the Coastal Commission would lead to "unwarranted uncertainty in connection with many local coastal program amendment approvals." *Ross v. Cal. Coastal Comm'n*, 199 Cal.App.4th 900, 938 (2011).

at 572–73; *Pac. Palisades Bowl*, 55 Cal.4th at 793–94 ("[A] fundamental purpose of the Coastal Act is to ensure that state policies prevail over the concerns of local government" within the coastal zone.). The district court should have enjoined its enforcement.

### B. The Ordinance Is Procedurally Invalid Under the Coastal Act

Santa Monica failed to comply with the Coastal Act's procedural requirements in two ways.

*First*, the Ordinance amends the City's LUP by regulating short-term rentals. As the Coastal Commission has stated, under the Coastal Act, "vacation rentals are a form of residential use, *permitted by right*, in any residentially zoned area unless such uses are *specifically prohibited or otherwise restricted*." ER-289 (emphasis added). Despite Santa Monica's contention to the contrary in the district court, it *never* "direct[ly] ban[ned]" short-term rentals until it enacted the Ordinance. ER-1815. Santa Monica's failure to obtain Commission approval for this amendment was unlawful. Cal. Pub. Res. Code § 30514(a), (b), (e); 14 Cal. Code Regs. § 13554(d)(3); 70 Ops. Cal. Atty. Gen. 220, 1987 WL 247254 (Sept. 10, 1987); *see Napa Valley Educators' Ass'n v. Napa Valley Unified Sch. Dist.*, 194 Cal.App.3d 243, 251 (1987) ("Opinions of the Attorney General, while not binding, are entitled to great weight.").

Santa Monica argued below that it can evade Commission review because it

did not label the Ordinance as an amendment to its certified Land Use Plan ("LUP"). ER-626. But labels do not control. The Act requires Commission review whenever a city seeks to "impose further conditions, restriction or limitations" on land use in the coastal zone, if the changes "conflict with any policy of Chapter 3 of the Coastal Act or with any other certified land use plan policy." 14 Cal. Code Regs. § 13554(d)(3); *see* 70 Ops. Cal. Atty. Gen. 220, 1987 WL 247254, at *6. That is exactly what Santa Monica did here.

Santa Monica also argued that the law requiring Commission approval of Local Coastal Plan ("LCP") amendments does not apply because the City has no certified LCP. But the Attorney General has determined that the Coastal Act's amendment provisions apply to LUPs as well as LCPs. 70 Ops. Cal. Att'y Gen. 220, 1987 WL 247254, at *4. And none of the precedent analyzing the Coastal Act's procedural requirements is limited to LCPs or excludes amendments to LUPs. *E.g.*, *Douda v. Cal. Coastal Comm'n*, 159 Cal.App.4th 1181, 1192 (2008).

The district court nevertheless deferred decision on this issue until the parties could present evidence whether Santa Monica enforced its purported "pre-Ordinance" ban on short-term rentals. ER-7. But the record shows that properties historically *were* available for short-term rentals in Santa Monica. ER-1815. And the record contains no evidence of any action to prevent, stop, or punish a resident from offering their home for a short-term rental before Santa Monica's recent

regulatory efforts. Thus, the City's enforcement of the Ordinance would undisputedly change access to the coast. *City of Dana Point v. Cal. Coastal Comm'n*, 217 Cal.App.4th 170, 208 (2013) (relevant question is enforcement); *Surfrider Foundation v. Cal. Coastal Comm'n*, 26 Cal.App.4th 151, 158 (1994) (imposition of access fees fell within the scope of Coastal Commission's authority). The district court erred by not immediately enjoining the Ordinance.

*Second*, the Ordinance constitutes "development" and therefore requires a CDP from the Commission. The district court ruled to the contrary, concluding that "development" does not include "city-wide land-use regulations." ER-8. But the court cited *nothing* in support of its cramped definition of "development," *id*., and "courts have given the term 'development' an 'expansive interpretation ... consistent with the mandate that the Coastal Act is to be 'liberally construed to accomplish its purposes and objectives.'" *Surfrider Foundation v. Martins Beach 1, LLC*, 14 Cal.App.5th 238, 252 (2017), *petition for cert. filed*, 17-1198 (U.S. Feb. 26, 2018) (citation omitted). "[D]evelopment goes beyond what is commonly regarded as a development of real property and is not restricted to activities that physically alter the land or water." *Id.* at 252 (citation omitted); *see Gualala Festivals Comm. v. Cal. Coastal Comm'n*, 183 Cal.App.4th 60, 67 (2010).

Here, the City does not have a certified LCP. As a result, *all* "development" in its coastal zone requires a CDP issued by the Commission. Cal. Pub. Res. Code

§ 30600(a). The Commission itself has stated that short-term rental restrictions change "the intensity of use and access to the shoreline," making them "development." ER-227. And the California Court of Appeal agrees, recently holding in a published decision that a short-term rental ban "changes the intensity of use and access" and therefore constitutes "development" under the Coastal Act. *Greenfield*, 230 Cal.Rptr.3d at 830.

Santa Monica therefore violated the Act procedurally because it failed to obtain a CDP before implementing the Ordinance in the coastal zone.

## IV. THE PLATFORMS FACE IRREPARABLE HARM ABSENT AN INJUNCTION

Although the district court did not reach the issue of irreparable harm, the harms resulting from the Ordinance are clear.

*First*, the Platforms face the threat of prosecution and hefty penalties under a preempted law. That alone constitutes irreparable harm. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992) ("irreparable injury" where plaintiffs faced choice between "expos[ing] themselves to potentially huge liability" or "suffer[ing] the injury of obeying" preempted law); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("irreparable harm" where plaintiff "demonstrated a credible threat of prosecution" under preempted state law).

*Second*, the Ordinance will impair consumer goodwill. If allowed to go into effect, the Ordinance will force the Platforms to alter substantially their operations

to avoid steep criminal and civil penalties. They will have to either monitor and remove listings (including potentially lawful ones) or redesign their sites to eliminate functions and features users want. *Supra* at 11, 21. This disruption to the Platforms' businesses will irreparably damage their standing with their users. ER-395–96; ER-504–05. This is precisely the kind of irreparable injury that warrants preliminary injunctive relief. *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009).

*Third*, the potential violation of the Platforms' free speech rights under the CDA and First Amendment constitutes irreparable harm. The loss of such freedoms "unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). Moreover, the CDA is designed to protect websites not only from "ultimate liability" but also from "having to fight costly and protracted legal battles." *Roommates.com*, 521 F.3d at 1175. If Santa Monica enforces the Ordinance before a decision on the merits, it will have succeeded in destroying CDA immunity.

*Fourth*, the Platforms will suffer competitive harms because the Ordinance will not regulate at least some rivals (*e.g.*, Craigslist). "A rule putting plaintiffs at a competitive disadvantage constitutes irreparable harm." *Int'l Franchise Ass'n*, 803 F.3d at 411.

## V. THE BALANCE OF THE EQUITIES AND PUBLIC INTEREST FAVOR THE PLATFORMS

The district court did not address the balance of the equities or public interest, but both factors sharply favor the Platforms. They face deprivation of constitutional rights, criminal penalties, lost goodwill, and competitive disadvantage. *Klein v. City of San Clemente*, 584 F.3d 1196, 1208 (9th Cir. 2009). "[I]t is always in the public interest to prevent the violation of a party's constitutional rights," *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012), and the public interest is served by "the Constitution's declaration that federal law is to be supreme," *Am. Trucking*, 559 F.3d at 1059–60.

Santa Monica, on the other hand, cannot claim immediate harm sufficient to outweigh the Platforms' injuries, nor is immediate enforcement in the public interest. Even if Santa Monica cannot enforce the Ordinance against the Platforms, it can still enforce short-term rental laws against hosts who fail to register their properties, and undertake other efforts to improve compliance with its laws.

## CONCLUSION

For these reasons, this Court should reverse the district court's decision denying a preliminary injunction.

DATED: April 18, 2018      MUNGER, TOLLES & OLSON LLP

By: * /s/ Donald B. Verrilli, Jr.*
     DONALD B. VERILLI, JR.

COTCHETT, PITRE & McCARTHY, LLP

By: * /s/ Joseph W. Cotchett*
     JOSEPH W. COTCHETT

Attorneys for Appellant Airbnb, Inc.

DAVIS WRIGHT TREMAINE LLP

By: * /s/ Stephen M. Rummage*
     STEPHEN M. RUMMAGE

Attorneys for Appellant HomeAway.com, Inc.

## FILER'S ATTESTATION

I, Donald B. Verrilli, Jr., certify that that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized the filing.

By: */s/ Donald B. Verrilli, Jr.*
DONALD B. VERRILLI, JR.
Attorney for Appellant Airbnb, Inc.

## STATEMENT OF RELATED CASES

HomeAway.com, Inc. and Airbnb, Inc. are not aware of any related cases that are currently pending in this Court.

**Form 8.** **Certificate of Compliance Pursuant to 9th Circuit Rules 28.1-1(f), 29-2(c)(2) and (3), 32-1, 32-2 or 32-4 for Case Number** 18-55367

Note: This form must be signed by the attorney or unrepresented litigant *and attached to the end of the brief.*

I certify that (*check appropriate option*):

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 28.1-1.
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☒ This brief complies with the length limits permitted by Ninth Circuit Rule 32-1.
The brief is 13,986 words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits permitted by Ninth Circuit Rule 32-2(b).
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable, and is filed by (1) ☐ separately represented parties; (2) ☐ a party or parties filing a single brief in response to multiple briefs; or (3) ☐ a party or parties filing a single brief in response to a longer joint brief filed under Rule 32-2(b). The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the longer length limit authorized by court order dated _____
The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6). The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable.

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 32-2 (a) and is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32 (f), if applicable. The brief's type size and type face comply with Fed. R .App. P. 32(a)(5) and (6).

☐ This brief is accompanied by a motion for leave to file a longer brief pursuant to Ninth Circuit Rule 29-2 (c)(2) or (3) and is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

☐ This brief complies with the length limits set forth at Ninth Circuit Rule 32-4.
The brief is _____ words or _____ pages, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Signature of Attorney or Unrepresented Litigant | s/ Donald B. Verrilli, Jr. | Date April 18, 2018

("s/" plus typed name is acceptable for electronically-filed documents)

# ADDENDUM

**47 U.S.C. § 230.**

**Protection for private blocking and screening of offensive material.**

**(a) Findings**

The Congress finds the following:

> **(1)** The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.

> **(2)** These services offer users a great degree of control over the information that they receive, as well as the potential for even greater control in the future as technology develops.

> **(3)** The Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity.

> **(4)** The Internet and other interactive computer services have flourished, to the benefit of all Americans, with a minimum of government regulation.

> **(5)** Increasingly Americans are relying on interactive media for a variety of political, educational, cultural, and entertainment services.

**(b) Policy**

It is the policy of the United States—

> **(1)** to promote the continued development of the Internet and other interactive computer services and other interactive media;

> **(2)** to preserve the vibrant and competitive free market that presently exists for the Internet and other interactive computer services, unfettered by Federal or State regulation;

**(3)** to encourage the development of technologies which maximize user control over what information is received by individuals, families, and schools who use the Internet and other interactive computer services;

**(4)** to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material; and

**(5)** to ensure vigorous enforcement of Federal criminal laws to deter and punish trafficking in obscenity, stalking, and harassment by means of computer.

## (c) Protection for "Good Samaritan" blocking and screening of offensive material

### (1) Treatment of publisher or speaker

No provider or user of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider.

### (2) Civil liability

No provider or user of an interactive computer service shall be held liable on account of—

**(A)** any action voluntarily taken in good faith to restrict access to or availability of material that the provider or user considers to be obscene, lewd, lascivious, filthy, excessively violent, harassing, or otherwise objectionable, whether or not such material is constitutionally protected; or

**(B)** any action taken to enable or make available to information content providers or others the technical means to restrict access to material described in paragraph (1).[1]

---

[1] So in original. Likely should be "subparagraph (A)."

**(d) Obligations of interactive computer service**

A provider of interactive computer service shall, at the time of entering an agreement with a customer for the provision of interactive computer service and in a manner deemed appropriate by the provider, notify such customer that parental control protections (such as computer hardware, software, or filtering services) are commercially available that may assist the customer in limiting access to material that is harmful to minors. Such notice shall identify, or provide the customer with access to information identifying, current providers of such protections.

**(e) Effect on other laws**

### (1) No effect on criminal law

Nothing in this section shall be construed to impair the enforcement of section 223 or 231 of this title, chapter 71 (relating to obscenity) or 110 (relating to sexual exploitation of children) of Title 18, or any other Federal criminal statute.

### (2) No effect on intellectual property law

Nothing in this section shall be construed to limit or expand any law pertaining to intellectual property.

### (3) State law

Nothing in this section shall be construed to prevent any State from enforcing any State law that is consistent with this section. No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section.

### (4) No effect on communications privacy law

Nothing in this section shall be construed to limit the application of the Electronic Communications Privacy Act of 1986 or any of the amendments made by such Act, or any similar State law.

**(5) No effect on sex trafficking law**

Nothing in this section (other than subsection (c)(2)(A)) shall be construed to impair or limit—

> **(A)** any claim in a civil action brought under section 1595 of title 18, United States Code, if the conduct underlying the claim constitutes a violation of section 1591 of that title;

> **(B)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 1591 of title 18, United States Code; or

> **(C)** any charge in a criminal prosecution brought under State law if the conduct underlying the charge would constitute a violation of section 2421A of title 18, United States Code, and promotion or facilitation of prostitution is illegal in the jurisdiction where the defendant's promotion or facilitation of prostitution was targeted.

## (f) Definitions

As used in this section:

### (1) Internet

The term "Internet" means the international computer network of both Federal and non-Federal interoperable packet switched data networks.

### (2) Interactive computer service

The term "interactive computer service" means any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server, including specifically a service or system that provides access to the Internet and such systems operated or services offered by libraries or educational institutions.

### (3) Information content provider

The term "information content provider" means any person or entity that is responsible, in whole or in part, for the creation or development of

information provided through the Internet or any other interactive computer service.

## (4) Access software provider

The term "access software provider" means a provider of software (including client or server software), or enabling tools that do any one or more of the following:

> **(A)** filter, screen, allow, or disallow content;

> **(B)** pick, choose, analyze, or digest content; or

> **(C)** transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

City Council Meeting: January 24, 2017                    Santa Monica, California

ORDINANCE NUMBER _2535_ (CCS)
(City Council Series)

AN ORDINANCE OF THE CITY COUNCIL OF THE CITY OF
SANTA MONICA AMENDING AND REVISING CHAPTER 6.20 OF THE SANTA
MONICA MUNICIPAL CODE REGULATING HOME-SHARING AND VACATION
RENTALS

WHEREAS, a central and significant goal for the City is preservation of its housing stock and preserving the quality and character of residential neighborhoods. Santa Monica places a high value on cohesive and active residential neighborhoods and the diverse population which resides therein. The City must preserve its available housing stock and the character and charm which result, in part, from cultural, ethnic, and economic diversity of its resident population as a key factor in economic growth; and

WHEREAS, Santa Monica's natural beauty, its charming residential communities, its vibrant commercial quarters and its world class visitor serving amenities have drawn visitors from around the United States and around the world; and

WHEREAS, there is within the City a diverse array of short term rentals for visitors, including, hotels, motels, bed and breakfasts, vacation rentals and home sharing, not all of which are lawful; and

WHEREAS, operations of vacation rentals, where residents rent entire units to visitors and are not present during the visitors' stays, frequently disrupt the quietude and residential character of the neighborhoods and adversely impact the community; and

1

WHEREAS, on May 12, 2015, the City Council adopted Ordinance Number 2484 which preserved the City's prohibition on vacation rentals, but authorized "home-sharing," whereby residents host visitors in their homes for short periods of stay, for compensation, while the resident host remains present throughout the visitors' stay; and

WHEREAS, home-sharing does not create the same adverse impacts as unsupervised vacation rentals because, among other things, the resident hosts are present to introduce their guests to the City's neighborhoods and regulate their guests' behavior; and

WHEREAS, while the City recognizes that home-sharing activities can be conducted in harmony with surrounding uses, those activities must be regulated to ensure that the small number of home-sharers stay in safe structures and do not threaten or harm the public health or welfare; and

WHEREAS, any monetary compensation paid to the resident hosts for their hospitality and hosting efforts rightfully belong to such hosts and existing law authorizes the City to collect Transient Occupancy Taxes ("TOTs") for vacation rentals and home-sharing activities; and

WHEREAS, existing law obligates both the hosts and rental agencies or hosting platforms to collect and remit TOTs to the City; and

WHEREAS, enforcement of the City's regulations on home-sharing, and prohibition on vacation rentals, can be extremely difficult without the cooperation of internet companies which facilitate both legal and illegal short term rentals; and

WHEREAS, to the fullest extent permitted by law, the City must be able to hold internet companies which profit from facilitating short-term rental transactions accountable for enabling illegal conduct; and

WHEREAS, the City Council now wishes to clarify its regulations on short term rentals as they apply to hosting platforms which are internet companies that collect income by facilitating transactions between hosts and visitors in the short term rental marketplace; and

WHEREAS, the City wishes to regulate the conduct of hosting platforms, but does not intend to regulate hosting platforms' publication or removal of content provided by third parties; and

WHEREAS, the City does not intend to require hosting platforms to verify content provided by third parties or to ensure that short term rental hosts comply with the provisions of this Chapter.

NOW, THEREFORE, THE CITY COUNCIL OF THE CITY OF SANTA MONICA DOES HEREBY ORDAIN AS FOLLOWS:

SECTION 1. Santa Monica Municipal Code Chapter 6.20 is hereby amended to read as follows:

**Chapter 6.20 HOME-SHARING AND VACATION RENTALS**

**6.20.010 Definitions.**

For purposes of this Chapter, the following words or phrases shall have the following meanings:

(a)   Home-Sharing. An activity whereby the residents host visitors in their homes, for compensation, for periods of thirty consecutive days or less, while at least one of the dwelling unit's primary residents lives on-site, in the dwelling unit, throughout the visitors' stay. (b)      Host. Any person who is an owner, lessee, or sub-lessee of a residential property or unit offered for use as a vacation rental or home-share. Host also includes any person who offers, facilitates, or provides services to facilitate, a vacation rental or home-share, including but not limited to insurance, concierge services, catering, restaurant bookings, tours, guide services, entertainment, cleaning, property management, or maintenance of the residential property or unit regardless of whether the person is an owner, lessee, or sub-lessee of a residential property or unit offered for use as a vacation rental or home-share. Any person, other than an owner, lessee, or sub-lessee, who operates home-sharing or vacation rental activities exclusively on the Internet shall not be considered a Host.

(c)      Hosting Platform. A person who participates in the home-sharing or vacation rental business by collecting or receiving a fee, directly or indirectly through an agent or intermediary, for conducting a booking transaction using any medium of facilitation.

(d)      Booking Transaction. Any reservation or payment service provided by a person who facilitates a home-sharing or vacation rental transaction between a prospective transient user and a host.

(e)      Person. Any natural person, joint venture, joint stock company, partnership, association, club, company, corporation, business trust, or organization of any kind.

(f)   Vacation Rental. Rental of any dwelling unit, in whole or in part, within the City of Santa Monica, to any person(s) for exclusive transient use of thirty consecutive days or

4

less, whereby the unit is only approved for permanent residential occupancy and not approved for transient occupancy or home-sharing as authorized by this Chapter. Rental of units located within City approved hotels, motels and bed and breakfasts shall not be considered vacation rentals.

### 6.20.020 Home-sharing authorization.

(a)   Notwithstanding any provision of this Code to the contrary, home-sharing shall be authorized in the City, provided that the host complies with each of the following requirements:

(1)   Obtains and maintains at all times a City business license authorizing home-sharing activity.

(2)   Operates the home-sharing activity in compliance with all business license permit conditions, which may be imposed by the City to effectuate the purpose of this Chapter.

(3)   Collects and remits Transient Occupancy Tax ("TOT"), in coordination with any hosting platform if utilized, to the City and complies with all City TOT requirements as set forth in Chapter 6.68 of this Code.

(4)   Takes responsibility for and actively prevents any nuisance activities that may take place as a result of home-sharing activities.

(5)   Complies with all applicable laws, including all health, safety, building, fire protection, and rent control laws.

(6)   Complies with the regulations promulgated pursuant to this Chapter.

5

(b)    All hosts and their respective properties, authorized by the City for home-sharing purposes pursuant to this Section, shall be listed on a registry created by the City and updated periodically by the City. The City shall publish the registry, and a copy shall be sent electronically to any person upon request.

(c)   If any provision of this Chapter conflicts with any provision of the Zoning Ordinance codified in Article IX of this Code, the terms of this Chapter shall prevail.

### 6.20.030 Prohibitions.

No host shall undertake, maintain, authorize, aid, facilitate or advertise any vacation rental activity or any home-sharing activity that does not comply with Section 6.20.020 of this Code.

### 6.20.050 Hosting platform responsibilities.

(a)    Hosting platforms shall be responsible for collecting all applicable TOTs and remitting the same to the City. The hosting platform shall be considered an agent of the host for purposes of TOT collections and remittance responsibilities as set forth in Chapter 6.68 of this Code.

(b)    Subject to applicable laws, Hosting platforms shall disclose to the City on a regular basis each home-sharing and vacation rental listing located in the City, the names of the persons responsible for each such listing, the address of each such listing, the length of stay for each such listing and the price paid for each stay.

(c)    Hosting platforms shall not complete any booking transaction for any residential property or unit unless it is listed on the City's registry created under section 6.20.020

subsection (b), at the time the hosting platform receives a fee for the booking transaction.

(d)     Hosting platforms shall not collect or receive a fee, directly or indirectly through an agent or intermediary, for facilitating or providing services ancillary to a vacation rental or unregistered home-share, including but not limited to insurance, concierge services, catering, restaurant bookings, tours, guide services, entertainment, cleaning, property management, or maintenance of the residential property or unit.

(e)     Safe Harbor: A Hosting Platform operating exclusively on the Internet, which operates in compliance with subsections (a), (b), (c), and (d) above, shall be presumed to be in compliance with this Chapter, except that the Hosting Platform remains responsible for compliance with the administrative subpoena provisions of this Chapter.

(f)     The provisions of this section shall be interpreted in accordance with otherwise applicable state and federal law(s) and will not apply if determined by the City to be in violation of, or preempted by, any such law(s).


**6.20.080 Regulations.**

The City Manager or his or her designee may promulgate regulations, which may include, but are not limited to, permit conditions, reporting requirements, inspection frequencies, enforcement procedures, advertising restrictions, disclosure requirements, administrative subpoena procedures or insurance requirements, to implement the provisions of this Chapter. No person shall fail to comply with any such regulation.


**6.20.090 Fees.**

The City Council may establish and set by resolution all fees and charges as may be necessary to effectuate the purpose of this Chapter.

**6.20.100 Enforcement.**

(a)   Any host violating any provision of this Chapter, or hosting platform that violates its obligations under section 6.20.050, shall be guilty of an infraction, which shall be punishable by a fine not exceeding two hundred fifty dollars, or a misdemeanor, which shall be punishable by a fine not exceeding five hundred dollars, or by imprisonment in the County Jail for a period not exceeding six months or by both such fine and imprisonment.

(b)   Any person convicted of violating any provision of this Chapter in a criminal case or found to be in violation of this Chapter in a civil or administrative case brought by a law enforcement agency shall be ordered to reimburse the City and other participating law enforcement agencies their full investigative costs, pay all back TOTs, and remit all illegally obtained rental revenue to the City so that it may be returned to the home-sharing visitors or used to compensate victims of illegal short term rental activities.

(c)   Any host who violates any provision of this Chapter, or hosting platform that violates its obligations under section 6.20.050, shall be subject to administrative fines and administrative penalties pursuant to Chapter 1.09 and Chapter 1.10 of this Code.

(d)   Any interested person may seek an injunction or other relief to prevent or remedy violations of this Chapter. The prevailing party in such an action shall be entitled to recover reasonable costs and attorney's fees.

8

(e) The City may issue and serve administrative subpoenas as necessary to obtain specific information regarding home-sharing and vacation rental listings located in the City, including but not limited to, the names of the persons responsible for each such listing, the address of each such listing, the length of stay for each such listing and the price paid for each stay, to determine whether the home-sharing and vacation rental listings comply with this Chapter. Any subpoena issued pursuant to this section shall not require the production of information sooner than 30 days from the date of service. A person that has been served with an administrative subpoena may seek judicial review during that 30 day period.

(f) The remedies provided in this Section are not exclusive, and nothing in this section shall preclude the use or application of any other remedies, penalties or procedures established by law.

SECTION 2. Any provision of the Santa Monica Municipal Code or appendices thereto inconsistent with the provisions of this Ordinance, to the extent of such inconsistencies and no further, is hereby repealed or modified to that extent necessary to effect the provisions of this Ordinance.

SECTION 3. If any section, subsection, sentence, clause, or phrase of this Ordinance is for any reason held to be invalid or unconstitutional by a decision of any court of competent jurisdiction, such decision shall not affect the validity of the remaining portions of this Ordinance. The City Council hereby declares that it would have passed this Ordinance and each and every section, subsection, sentence, clause, or phrase not declared invalid or unconstitutional without regard to whether any portion of the ordinance would be subsequently declared invalid or unconstitutional.

9

SECTION 4. The Mayor shall sign and the City Clerk shall attest to the passage of this Ordinance. The City Clerk shall cause the same to be published once in the official newspaper within 15 days after its adoption. This Ordinance shall become effective 30 days from its adoption.

APPROVED AS TO FORM:

JOSEPH LAWRENCE
Interim City Attorney

10

Approved and adopted this 24th day of January, 2017.

_Ted Winterer_

Ted Winterer, Mayor

State of California      )
County of Los Angeles    ) ss.
City of Santa Monica     )

I, Denise Anderson-Warren, City Clerk of the City of Santa Monica, do hereby certify that the foregoing Ordinance No. 2535 (CCS) had its introduction on January 10, 2017, and was adopted at the Santa Monica City Council meeting held on January 24, 2017, by the following vote:

AYES:    Councilmembers McKeown, O'Connor, O'Day, Vazquez, Mayor Pro Tem Davis, Mayor Winterer

NOES:    None

ABSENT: Councilmember Himmelrich

ATTEST:

_Denise Anderson-Warren_                 2/23/17

Denise Anderson-Warren, City Clerk            Date

A summary of Ordinance No. 2535 (CCS) was duly published pursuant to California Government Code Section 40806.

## CERTIFICATE OF SERVICE

I hereby certify that on April 18, 2018, I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


*/s/ Donald B. Verrilli, Jr.*

April 18, 2018                           Donald B. Verrilli, Jr.